# UNITED STATES DISTRICT COURT

for the

Western District of North Carolina ▾

Asheville Division

**FILED**
**ASHEVILLE, N.C.**

**FEB 2 0 2020**

**U.S. DISTRICT COURT**
**W. DIST. OF N.C.**

BRO. T. HESED-EL

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.   CV 119-285

*(to be filled in by the Clerk's Office)*

Jury Trial: *(check one)* [✓] Yes [ ] No

_____
*Plaintiff(s)*
*(Write the full name of each plaintiff who is filing this complaint.*
*If the names of all the plaintiffs cannot fit in the space above,*
*please write "see attached" in the space and attach an additional*
*page with the full list of names.)*

**–v–**

JOHN DOE, et al.,

_____
*Defendant(s)*
*(Write the full name of each defendant who is being sued. If the*
*names of all the defendants cannot fit in the space above, please*
*write "see attached" in the space and attach an additional page*
*with the full list of names. Do not include addresses here.)*

AMENDED

## COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

(Non-Prisoner Complaint)

---

### NOTICE

Federal Rules of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number.

Except as noted in this form, plaintiff need not send exhibits, affidavits, grievance or witness statements, or any other materials to the Clerk's Office with this complaint.

In order for your complaint to be filed, it must be accompanied by the filing fee or an application to proceed in forma pauperis.

---

## I. The Parties to This Complaint

### A. The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

| | |
|---|---|
| Name | BRO. T. HESED-EL |
| Address | c/o TAQI EL AGABEY MANAGEMENT 30 N. Gould Street, Ste R |

| Sheridan | WY | 82801 |
|---|---|---|
| *City* | *State* | *Zip Code* |

| | |
|---|---|
| County | Sheridan |
| Telephone Number | 762-333-2075 |
| E-Mail Address | teamwork3@gmail.com |

### B. The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title (if known) and check whether you are bringing this complaint against them in their individual capacity or official capacity, or both. Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | JOHN DOE |
| Job or Title *(if known)* | |
| Address | |

| Asheville | NC | 28801 |
|---|---|---|
| *City* | *State* | *Zip Code* |

| | |
|---|---|
| County | Buncombe County |
| Telephone Number | |
| E-Mail Address *(if known)* | |

[✓] Individual capacity    [ ] Official capacity

Defendant No. 2

| | |
|---|---|
| Name | Robin Bryson |
| Job or Title *(if known)* | Licensed Clinical Social Worker |
| Address | 428 Biltmore Ave |

| Asheville | NC | 28801 |
|---|---|---|
| *City* | *State* | *Zip Code* |

| | |
|---|---|
| County | Buncombe |
| Telephone Number | |
| E-Mail Address *(if known)* | |

[ ] Individual capacity    [✓] Official capacity

Defendant No. 3

|  |  |  |  |
|---|---|---|---|
| Name | Mission Hospital, Inc. | | |
| Job or Title *(if known)* | | | |
| Address | 509 Biltmore Ave | | |
| | Asheville | NC | 28801 |
| | *City* | *State* | *Zip Code* |
| County | Buncombe | | |
| Telephone Number | | | |
| E-Mail Address *(if known)* | | | |

☐ Individual capacity ☑ Official capacity

Defendant No. 4

|  |  |  |  |
|---|---|---|---|
| Name | County of Buncombe | | |
| Job or Title *(if known)* | | | |
| Address | 200 College Street, Ste 300 | | |
| | Asheville | NC | 28801 |
| | *City* | *State* | *Zip Code* |
| County | Buncombe | | |
| Telephone Number | | | |
| E-Mail Address *(if known)* | | | |

☐ Individual capacity ☑ Official capacity

## II.  Basis for Jurisdiction

Under 42 U.S.C. § 1983, you may sue state or local officials for the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." Under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971)*, you may sue federal officials for the violation of certain constitutional rights.

A.  Are you bringing suit against *(check all that apply)*:

☐ Federal officials (a *Bivens* claim)

☑ State or local officials (a § 1983 claim)

B.  Section 1983 allows claims alleging the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." 42 U.S.C. § 1983. If you are suing under section 1983, what federal constitutional or statutory right(s) do you claim is/are being violated by state or local officials?

See attached for violation of 1st Amendment, 4th Amendment, and 14th Amendment and related tort claims under state law.

C.  Plaintiffs suing under *Bivens* may only recover for the violation of certain constitutional rights. If you are suing under *Bivens*, what constitutional right(s) do you claim is/are being violated by federal officials?

D. Section 1983 allows defendants to be found liable only when they have acted "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia." 42 U.S.C. § 1983. If you are suing under section 1983, explain how each defendant acted under color of state or local law. If you are suing under *Bivens*, explain how each defendant acted under color of federal law. Attach additional pages if needed.

Plaintiff's right to liberty is a clearly established right. The defendants knowingly violated Plaintiff's right to liberty without probable cause as Plaintiff did not meet the criteria for an IVC. See attachment in relation to stari decis, O'Connor v. Donaldson, 422 U.S. 563 (1975).

## III. Statement of Claim

State as briefly as possible the facts of your case. Describe how each defendant was personally involved in the alleged wrongful action, along with the dates and locations of all relevant events. You may wish to include further details such as the names of other persons involved in the events giving rise to your claims. Do not cite any cases or statutes. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

A. Where did the events giving rise to your claim(s) occur?

Biltmore Estate and Mission Hospital

See attached.

B. What date and approximate time did the events giving rise to your claim(s) occur?

09/20/2016 @ 1pm thru 10/05/2016 @ 3pm

See attached.

C. What are the facts underlying your claim(s)? *(For example: What happened to you? Who did what? Was anyone else involved? Who else saw what happened?)*

Plaintiff was not mentally ill. Plaintiff was not dangerous to self. Plaintiff was not dangerous to others. The defendants willfully violated required protocol and violated Plaintiff's clearly established rights in seeking to have Plaintiff treated under the most restrictive means available.

See attached.

## IV.    Injuries

If you sustained injuries related to the events alleged above, describe your injuries and state what medical treatment, if any, you required and did or did not receive.

Plaintiff suffered permanent physical injuries. Plaintiff also suffered extensive emotional distress and harm.

See attached

## V.    Relief

State briefly what you want the court to do for you. Make no legal arguments. Do not cite any cases or statutes. If requesting money damages, include the amounts of any actual damages and/or punitive damages claimed for the acts alleged.  Explain the basis for these claims.

Plaintiff demands montary compensation and complete expungement of records of IVC proceedings.

See attached

## VI.  Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.  For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:  02/18/2020

Signature of Plaintiff

Printed Name of Plaintiff  BRO. T. HESED-EL

### B.  For Attorneys

Date of signing:

Signature of Attorney

Printed Name of Attorney

Bar Number

Name of Law Firm

Address

|  | City | State | Zip Code |
|---|---|---|---|

Telephone Number

E-mail Address

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| BRO. T. HESED-EL, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. CV 119-285 |
| v. | ) | |
| | ) | |
| JOHN DOE, et al., | ) | |
| | ) | |
| Defendants. | ) | |

### COMPLAINT ATTACHMENT
### Divine Laws of the Holy Koran of Mecca
### American-Islamic Jurisprudence
#### *Memorandum of Law*

Allah does not like the public mention of evil except by one to whom injustice has been done; And ever is Allah Hearing and Knowing. *Surah 4:[]4[]*

**COMES NOW,** Plaintiff *pro se* Br. T. Hesed-El ("Plaintiff"), in good faith, without the benefit of a licensed attorney pursuant to Haines v. Kerner, 404 U.S. 519 (1972), to redress the misconduct of John Doe ("JD"), Robin Bryson ("RB"), Mission Hospital, Inc. ("MHI"), Hospital Does 1-10 ("HD"), and County of Buncombe ("BC"), collectively ("Defendants"). Plaintiff seeks recovery of damages and demands a jury trial of his national peers. Plaintiff respectfully shows as follows:

### I.   INTRODUCTION

What is it about mankind that drives it to put people in boxes?
https://www.youtube.com/watch?v=jD8tjhVO1Tc&feature=youtu.be

This §1983 action arises out of BC's malicious and corrupt misuse of the IVC process to unlawfully deprive Plaintiff of his liberty. Here, Plaintiff was detained in MHI's unsafe environment for 16 days based on RB's false affidavit. In her IVC petition, RB falsely swore that she had first-hand knowledge that Plaintiff was suffering from a mental illness. Mental illness means "an illness which so lessens the capacity of the individual to use self-control, judgment, and discretion in the conduct of his affairs and social relations as to make it necessary or advisable for him to be under treatment, care, supervision, guidance, or control." N.C. Gen. Stat. § 122C-3(21).

As will be shown through the framework of this complaint, insha'Allah, RB's opinion was not based on any facts or accepted medical standards for imminent dangerousness; but instead, her opinion was solely based on her religious bias. "Preoccupation with religion is insufficient to support a finding of mental illness." In Matter of Trice, 706 S.E.2d 841, 6 (N.C. Ct. App. 2010).

Thus, Plaintiff should not have been subjected to forced medications; mental health examinations; an assault/battery by another patient; and a 16th day release without a 10-day court hearing.

As will be shown through the framework of this complaint, insha'Allah, Plaintiff was "denied his right to a hearing before the district court within ten days of confinement [N.C. Gen. Stat. § 122C-268(a)]... The statute indicates a conscious legislative decision to place the burden on the State to come forward with evidence to justify the commitment within 10 days... taking a person without the intervention of any court proceeding is a drastic procedure." In re Jacobs, 38 N.C. App. 573, (N.C. Ct. App. 1978). As a result of Defendants' willful misconduct, Plaintiff suffered bodily harm, mental anguish and emotional harm.

## II.   NOTICE TO THE FACTFINDER

TAKE NOTICE that this complaint is not about the false and contradictory findings that MHI's staff wrote in the first examination, psychiatric notes, interviews, and second examination. This action is about their reckless disregard of required IVC protocol and Plaintiff's rights, interests, and safety. TAKE NOTICE that no commitment hearing was ever held in this matter and Plaintiff is not challenging a state-court decision. The Rooker-Feldman doctrine is inapplicable to this case.

TAKE NOTICE that while in MHI's custody, the legal injuries of MHI's violations were not readily apparent. While in MHI's custody, Plaintiff was not served with any notice of a pending commitment hearing in the state district court; MHI did not provide Plaintiff with sufficient information about the IVC procedures so that he could make any informed decisions; Plaintiff was deprived of his choice of counsel to represent him; and Plaintiff was not informed of his right to counsel in the matter. The IVC records were sealed by BC's Special Proceedings division.

TAKE NOTICE that after Plaintiff was released from MHI's custody, Plaintiff suffered from severe emotional distress caused by MHI's unnecessary treatments. It took Plaintiff a significant amount of time to recuperate from the trauma caused by the assault and MHI's forced medication.

TAKE NOTICE that, at all times relevant hereto, no commitment order was ever issued in this matter. TAKE NOTICE that Plaintiff was exercising his rights and practicing his religion in a way that posed no threat of harm or danger to himself or others. BC/MHI and their representatives were rendering assistance during a non-emergency, and based on their opinions that Plaintiff's sincerely held religious beliefs and caution against overreaching governments is "grandiose", "delusional", and "paranoid", Plaintiff was held against his will at MHI for 16 days in violation of law.

The critical question now before the Court is whether RB was acting as an agent of the State in swearing out the IVC petition to have Plaintiff involuntarily committed, and in doing so, whether the State sought the least restrictive means of achieving a compelling or overriding state interest.

## III.    JURISDICTION & VENUE

**1.**

**Plaintiff Bro. T. Hesed-El** is a Moorish-American Moslem governed under the divine Laws of the Holy Koran of Mecca, Love, Truth, Peace, Freedom and Justice. Plaintiff, a natural person, is A CITIZEN OF THE U.S.A. According to 28 U.S.C. §§ 1331, 1332, 1343 and 1367, Plaintiff brings this action to vindicate his rights secured by the 1st, 4th and 14th amendments. Plaintiff is not a citizen of the State of North Carolina and is not subject to its jurisdiction.

**2.**

**Defendant John Doe**, upon information and belief, is subject to the jurisdiction and venue of the Court. Defendant JD is the individual MHI patient who assaulted Plaintiff while in the care and custody of Mission Hospital, Inc. JD is believed to be a citizen of North Carolina. JD's address is not known at this time. Plaintiff reserves his right to amend this complaint after discovery.

**3.**

**Defendant Robin Bryson**, upon information and belief, is subject to the jurisdiction and venue of the Court. Defendant RB is a Licensed Clinical Social Worker under contract with the State of North Carolina. RB is also an employee of Mission Hospital, Inc. RB earned money through her job at MHI by cooperating with the state to provide medical care to Plaintiff as alleged in this complaint. RB is a citizen of the State of North Carolina and can be served with court process at her current address: 428 Biltmore Avenue, Asheville, NC 28801.

**4.**

**Defendant Mission Hospital, Inc.**, upon information and belief, is subject to the jurisdiction and venue of the Court. Defendant MHI is Christian-based hospital organized as a non-profit corporation under the laws of the State of North Carolina. MHI's principal place of business is located at 509 Biltmore Ave, Asheville, NC 28801. MHI may be served with process through its agent, Corporation Service Company, at 2626 Glenwood Ave, Suite 550, Raleigh, NC 27608.

**5.**

**Defendant County of Buncombe**, upon information and belief, is subject to the jurisdiction and venue of the Court. Defendant BC is a political subdivision of the State of North Carolina. BC

is located at 200 College Street, Asheville, NC 28801. BC may be served with process through its County Manager, Avril Pender, at 200 College Street, Suite 300, Asheville, NC 28801.

## IV.  <u>PROCEDURAL BACKGROUND</u> – *Section A.*

Pursuant to FRCP Rule 10(c), Plaintiff incorporates by reference the attached Affidavit in Support, as if fully stated in this paragraph, to explain the procedural background of this action.

### *FACTS ABOUT PLAINTIFF'S HEALTH AND PROFESSION – Section B.*

**6.**

Under Georgia law, "natural persons are categorized, according to their rights and status." <u>O.C.G.A. § 1-2-2</u>. Plaintiff retains all his inherent rights. Plaintiff has not waived any of his rights.

**7.**

Plaintiff was born outside the city limits of Augusta, in the State of Georgia, 1985. Plaintiff has two siblings. Some of the great fathers through which Plaintiff came are: Abraham, Boaz by Ruth, Jesse, King David, Solomon, Hezekiah, and Joseph by Mary. Plaintiff is a descendant of the ancient Moabites who first inhabited this land. In the Great Law of Peace of the Iroquois Confederation, Plaintiff's ancestors are referred to as the Onkwehonwe, or *original beings.*

From the time Plaintiff was born in 1985 to *present*, he has not ever been committed by court order to a mental institution or deemed dangerous to himself or others by a competent medical professional. Plaintiff has no history of mental illness nor any record of violent or suicidal behavior. Plaintiff works full time as a civil rights coordinator for a non-profit organization. Plaintiff, a full-time MBA student at the Maharishi International University, usually prays 5x times a day, and practices the transcendental meditation technique.

Plaintiff is not a substance abuser – any statements to the contrary are false. Plaintiff is not suicidal and has no record of suicidal tendencies. Plaintiff has not attempted to kill himself or threatened to kill himself. In the relevant past, Plaintiff has not threatened to harm any living being. Plaintiff even tries to avoid killing insects. In Plaintiff's society, it is common to abstain from all vaccinations (needles), allopathic medicines, GMOs, and artificial foods that may harm the body. Plaintiff has maintained overall good health and behavior his entire life by abstaining from the destructive ideals and practices of the pale-skin nations of Europe and blacks. Alhamdullilah.

*FACTS ABOUT PLAINTIFF'S SINCERELY HELD RELIGIOUS BELIEFS – Section C.*

**8.**

Plaintiff's late father was a Bishop. Plaintiff's mother is a former senior pastor. Together, Plaintiff's parents founded the Cathedral of the Holy Spirit at Living Word Christian in Augusta, Georgia during the late 1970's. As such, Plaintiff was raised with an in-depth knowledge of the Judeo-Christian faith.

From around January 2013 to December 2014, Plaintiff worked in Asheville, NC. During that time, Plaintiff frequently attended live music events, ate good food, attended consciousness-music festivals, and enjoyed other camping excursions around the Blue Ridge Mountains. As part of his awakening, Plaintiff's mind began to return to its original state of purity, similar to that of Adam and Eve before they ate of the Tree of Knowledge of Good and Evil. "And they were both naked, the man and his wife, and were not ashamed." Helios Biblios, Genesis 2:25.

During Gratifly, a consciousness-festival that Plaintiff attended around that time, Plaintiff was reminded of his ancestors' mindset which existed prior to our exile from the Garden of Eden. At that festival, both men and women roamed around the lush environment of Lake Hartwell in the nude. No one seemed to be ashamed. People of diverse ages and ethnicities were in attendance.

Further, even when the county sheriff's department approached our camping grounds on its boat to observe our 1st Amendment expressions at the festival, they made no arrests and bothered no one. They simply showed their presence, then turned their boat around and returned to the place from whence they came. That experience served as a perpetual reminder that there really is no problem with being naked on a private estate.

During Gratifly, Plaintiff camped out in front of the river next to a neighboring couple who had a young baby. On some days, Plaintiff bathed nude in the river, got dressed, and ate breakfast freshly cooked over the fire with his neighbors. Everyone was comfortable in this setting, and no one seemed to feel that anything was wrong with such expressions in the middle of the woods.

It is not uncommon in Asheville for people to express their individuality through nudity. Plaintiff attended numerous nude gatherings around Asheville. It is equally common in Asheville for someone to choose to meditate in the woods. Plaintiff believes that only the lying words of a serpent could cause shame to the point of accusing a man of acting "strange" because of his nudity:

> Now the serpent was more subtil than any beast of the field which the Lord God had made. And he said unto the woman, Yea, hath God said, Ye shall not eat of every tree of the garden? And the woman said unto the serpent, We may eat of the fruit of the trees of the garden: But of the fruit of the tree which is in the midst of the garden, God hath said, Ye shall not eat of it, neither shall ye touch it, lest ye die.

And the serpent said unto the woman, Ye shall not surely die: For God doth know that in the day ye eat thereof, then your eyes shall be opened, and ye shall be as gods, knowing good and evil. And when the woman saw that the tree was good for food, and that it was pleasant to the eyes, and a tree to be desired to make one wise, she took of the fruit thereof, and did eat, and gave also unto her husband with her; and he did eat. And the eyes of them both were opened, and they knew that they were naked; and they sewed fig leaves together, and made themselves aprons. And they heard the voice of the Lord God walking in the garden in the cool of the day: and Adam and his wife hid themselves from the presence of the Lord God amongst the trees of the garden. And the Lord God called unto Adam, and said unto him, Where art thou? And he said, I heard thy voice in the garden, and I was afraid, because I was naked; and I hid myself. And he said, Who told thee that thou wast naked? Hast thou eaten of the tree, whereof I commanded thee that thou shouldest not eat? 12 And the man said, The woman whom thou gavest to be with me, she gave me of the tree, and I did eat. And the Lord God said unto the woman, What is this that thou hast done? And the woman said, The serpent beguiled me, and I did eat. Helios Biblios, Genesis 3:1-13.

In 2015, Plaintiff reverted back to the old-time religion of his ancestors, Islamism. It is common for Citizens of the Moorish-American Society to frequently discuss the religion of Islam, study the old law, and enforce laws in accordance with the United Nations Declaration on the Rights of Indigenous Peoples. "All Members must preserve these Holy and Divine laws…" Divine Constitution of the Asiatic Nation of North America, Article IV, cl. 1.

"With us all members must proclaim their nationality, and we are teaching our people their nationality and Divine Creed that they may know that they are a part and a partial of this said government, and know that they are not Negroes, Colored Folks, Black People, or Ethiopians, because these names were given to slaves by slave holders in 1779 and lasted until 1865 during the time of slavery… The Moorish Americans are the descendants of the ancient Moabites who inhabited the North Western and South Western shores of Africa." Id., Article VI.

Plaintiff sincerely believes in the faith instilled in him by the Great-God Allah through his messenger. Plaintiff does not view other people as being inferior to himself. Plaintiff loves all mankind as himself because "[n]o man lives unto himself, for every living thing is bound by cords to every other living thing." Holy Koran of the Moorish Science Temple, p. 7, ¶ 2.

The Holy Prophet said, "Every word that I speak is spirit, and you Moors had better heed. *(That is give it attention, obey).*" Oral Statements of the Prophet, p. 2, ¶7. The Holy Prophet said, "This food here, is just European poison." *Id.*, p. 32, ¶ 178. Jesus also said, "Teach them that Allah and man are one…" Holy Koran of the Moorish Science Temple, p. 6, ¶ 18. "I and the Father are one." Helios Biblios, John 10:30. "Verily, verily, I say unto you, He that believeth on me, the

works that I do shall he do also; and greater *works* than these shall he do; because I go unto my Father." *Id.*, John 14:12.

As a Moorish-American Moslem, Plaintiff is aboriginal to the Americas. Plaintiff's beliefs, customs, actions, and traditions are not to be compared with that of the pale-skin nations of Europe, black persons, because Plaintiff is not of the European caste system nor is he a black person. Plaintiff is an upstanding member of his community, ordained minister, and former college teacher. Plaintiff reserves all of his rights of the Asiatic Nation of the States of North America.

### FACTS ABOUT PLAINTIFF'S NUDE SUNBATHING – Section D.

**9.**

On 9/18/2016, drove to Asheville for a short vacation. When he arrived, he checked into his room at the Grand Bohemian Hotel: Manor House. On 9/20/2016, Plaintiff visited the Biltmore Estate. He parked his car in their parking lot and walked onto their private grounds. Once he was passed the gates, Plaintiff was captivated by the beauty of the land. Plaintiff walked along the streams on the property in a state of gratitude for Allah's many blessings. Plaintiff was thoroughly enjoying the solitude and the deep sense of peace present in that moment. After a while, Plaintiff lay on the ground by a flowing stream to take a nap in the Sun.

When Plaintiff awoke, it was still daylight. No other people were in sight. Plaintiff looked around again just to make sure he was alone in that area. Feeling completely unencumbered at that time, Plaintiff decided to enjoy an afternoon stroll in the woods. Plaintiff stood up, took off his clothes, and placed them neatly folded by the stream. He also placed his car key under a large rock near the stream to ensure it would be there when he returned. He then walked away from the stream, and into the heavily wooded private forest area of the estate, even further away from the general public. At that time, Plaintiff was in a complete state of meditation in the timeless presence of the Most High. Plaintiff had no cuts, bruises, or weapons on his person. Plaintiff was not making any loud sounds or disturbing the peace. Plaintiff was not committing any violent acts. Plaintiff was ***not*** dangerous to self or others. Plaintiff was simply enjoying an afternoon stroll in the woods.

**10.**

While in the private wooded area, Plaintiff was approached by two private security guards and an Asheville police deputy. In response to their sudden appearance and perceived hostility, Plaintiff immediately laid still on the ground, on his back, with his arms and legs spread in the open position to lower his chances of being shot. (*People streak public events all the time and aren't committed to a mental institution for it, but for some reason, the guards and the Asheville police felt uncomfortable seeing Plaintiff's nakedness.*) The deputy quickly brought a white sheet

and placed it over Plaintiff's private parts. While under the deputy's detention, one of them asked Plaintiff: *Are you alright?* **Plaintiff responded using sign language.** With a right handed "thumbs up", Plaintiff told them he was "alright". The Asheville deputy acknowledged Plaintiff's response.

## 11.

The guards were reasoning among themselves trying to figure out why Plaintiff wouldn't speak. The Asheville deputy police verbally reminded the guards that Plaintiff had responded with a non-verbal "thumbs-up" to indicate he was free of injury and mental impairment. The guards indicated to the Asheville deputy that they were aware of Plaintiff's non-verbal responses.

## 12.

A few moments later, the Sheriff arrived on the scene and assumed custody of Plaintiff. The Sheriff asked the others: *Ya'll really want me to take him to jail?* The Sheriff did not offer Plaintiff an opportunity to get dressed or voluntarily leave. The Sheriff knew that if he arrested Plaintiff for a crime, he would have to do paperwork. To avoid his duty, he had Plaintiff taken to MHI instead. In bad faith, the Sheriff detained Plaintiff at MHI.

## 13.

Despite that there was no legitimate reason for the Sheriff to continue Plaintiff's detention at MHI, the Sheriff willfully and wantonly deviated from accepted law enforcement standards in delegating his duty to MHI's employees. The Sheriff knew that Plaintiff would be deprived of his liberty as a result of his avoidance of standard procedures. The Sheriff did not inform Plaintiff that is was not under arrest and has not committed a crime. The Sheriff did not inform Plaintiff that he was being transported to receive treatment for his or own safety and that of others. The Sheriff demonstrated a complete disregard for Plaintiff's rights and expressed no remorse for Plaintiff's resulting injuries.

## 14.

Prior to taking custody of Plaintiff, the Sheriff willfully failed to inform Plaintiff that he was not under arrest and has not committed a crime. Once there, MHI's employee, HD-1, drew Plaintiff's blood for the Sheriff without consent and without a search warrant.[1] Shortly after, Plaintiff walked to a nearby MHI computer, logged into his Facebook account, and posted on his timeline: *Choose ye this day who you shall serve.*

---

[1] The Sheriff's comments about taking Plaintiff to jail implies that the Sheriff was called to the scene to arrest Plaintiff for trespassing and/or indecent exposure. Plaintiff remained in the Sheriff's custody from the moment of arrest on 9/20/2016 until custody was transferred to MHI on 9/26/2016 at 5:38 PM. Plaintiff purchased a season pass to the Biltmore Estate which granted him full access to roam around their private grounds.

## FACTS ABOUT RB'S FALSE IVC PETITION – Section E.

### 15.

That night while Plaintiff was asleep, RB, by direction of the Sheriff, swore out a petition to commence the procedure to have Plaintiff involuntarily committed to a mental institution. The statements expressed in RB's affidavit for IVC were demonstrably false. RB based her false affidavit on Christian beliefs and bias. RB had no prior knowledge of Plaintiff, his habits, history, cultures, values, friends, or family. Plaintiff did not receive a copy of her affidavit until Jan. 2019.

### 16.

Merely regurgitating the statute, RB filled out an IVC form petition and placed a "X" in certain boxes to indicate that Plaintiff was mentally ill and dangerous to self an others, as defined by N.C. Gen. Stat. § 122C-3(11). "Merely placing an "X" in the boxes... does not comply with the statute" In re J.C.D., No. COA18-957, 12 (N.C. Ct. App. May. 21, 2019). The alleged facts upon which her opinion was based were stated in the petition as follows: "Patient's thought content displays delusional thinking – "we are all family in this universe. I am the god and you are my people young sister"; 2) "laughing inappropriately"; and (3) "he is hypervigilant" (e.g. mental alertness). RB's petition contained nothing more than conclusory allegations based on her bias.

### 17.

RB's conclusory allegations were false and contained no facts or evidence that Plaintiff was dangerous to self and others. RB's conclusory allegation that Plaintiff's mental status was "altered" was not based on any prior knowledge of Plaintiff's alleged "unaltered" mental state. RB falsely concluded that Plaintiff couldn't contract for his safety by himself or with his family's help.

### 18.

RB knew that Plaintiff's behavior did not fit the criteria for an involuntary commitment. RB knew that if she filed the IVC petition with the State, Plaintiff would be deprived of his rights and subjected to unnecessary medical and psychological treatments. Upon information and belief, RB was reckless in concluding that Plaintiff's alleged religious expressions, laughter, mental alertness due to regular meditation, and nudity were grounds for an IVC under color of law.

### 19.

RB's IVC petition/affidavit against Plaintiff was made in bad faith. At all times, RB knew she owed a duty to Plaintiff to comply with accepted medical standards and required protocols. But instead of doing so, RB intentionally disregarded her duties and sought the most restrictive method of chilling Plaintiff's religious expression. RB's actions were done on behalf of the Sheriff, but there was no genuine compelling or overriding governmental interest. North Carolina's stated

policy, in fact, is to "favor a less restrictive mode of treatment than involuntary commitment whenever appropriate." Currie v. United States, Civ. No. C-85-0629-D, 1081 (M.D.N.C. 1986). RB acted outside the scope of her duties in making unreasonable inquiry into Plaintiff's religious beliefs and then using his alleged religious responses as a basis for an involuntary commitment.

**20.**

The next day, after RB submitted her IVC petition *(Plaintiff didn't see her petition until Jan. 2019)*, Plaintiff was moved to MHI's secured holding area for patients who have not yet been admitted into a 24-hour facility. At that time, no bed was available in MHI's Copestone program.

### *FACTS ABOUT MHI'S PREMISES NEGLIGENCE – Section F.*

**21.**

Seven days later, he was admitted into MHI's Copestone ward for violent IVC patients.

**22.**

The Copestone ward was a very unsafe environment where violent patients, substance abusers, and mentally ill persons were held against their will. One patient said that his dad had placed him MHI's mental ward because he kept starting fires. Plaintiff felt that he needed to remain on guard at all times to prevent being attacked by one or more of MHI's patients.

**23.**

On or about the 10th day of confinement, Plaintiff was unreasonably placed in "time-out". *("Time-out" is like "the hole" as used in state and federal penitentiaries. The room was locked from the outside and Plaintiff was not allowed to freely roam the Copestone ward's hallways while in time-out.)* While in time-out, Plaintiff was free-style rapping out loud and it apparently got on HD-3's nerves. HD-3 threatened Plaintiff that he must be quiet during the quiet hours, and if he didn't be quiet, he would be tranquilized. Plaintiff continued to rap out loud as an act of free will.

**24.**

In response, HD-3 and HD-4 rushed into Plaintiff's time-out cell with two police deputies. To prevent any possibility of being shot or beaten, Plaintiff was already lying down on his floor mat, on his back, with his hands and feet visible. Three of those employees held Plaintiff's body to the ground while HD-3 began to administer a heavy sedative into Plaintiff's bloodstream. Plaintiff calmly informed them: *I do not consent. I do not consent. I do not consent.* Plaintiff made sure to make direct eye contact with the female deputy and other employees while saying that.

**25.**

After they exited Plaintiff's solitary confinement cell, Plaintiff got up and returned to free-styling at his cell window. Shortly after, the tranquilizer began to kick-in. As a result, Plaintiff could no longer stand up. He fell asleep. The next morning, Plaintiff was released from the hole and allowed to return to the patients' common area. There, he saw JD, a patient in MHI's custody. Plaintiff recalls seeing JD around the first day Plaintiff arrived in the Copestone ward.

**26.**

Upon information and belief, at this point, Plaintiff had been in custody exceeding 10 days.

**27.**

While Plaintiff was sitting in the patients' common area calmly having a calm conversation with a couple of patients, JD stood up and violently punched Plaintiff in his left eye. Plaintiff noticed that his eye was bleeding and his vision was blurry. However, Plaintiff did not hit JD; neither before nor after JD hit Plaintiff.

**28.**

After watching Plaintiff get physically attacked by JD, HD-3 rushed over to Plaintiff and informed Plaintiff that he saw the whole thing. However, HD-3 made no actions or attempts to prevent the attack or provide adequate medical treatment for the injuries to Plaintiff's left eye and face. Instead, HD-3 asked Plaintiff if he wanted to press charges against JD.

**29.**

At all relevant times, MHI and its employees knew, or should have known, of JD's violent propensities. JD was purposely held in the violent ward of MHI's Copestone program. MHI and its employees had the legal right, ability, and opportunity to control JD at the time of the attack, but failed to protect Plaintiff from that foreseeable harm.

**30.**

Shortly after the attack, a police or sheriff deputy approached Plaintiff and informed him that he could file charges against JD once he was released from the Copestone ward. However, MHI never revealed JD's name to Plaintiff so that he could press charges against him.

**31.**

Right after that, HD-3 informed Plaintiff that he was being moved out of the violent ward of the Copestone facility and being taken to the ward where the non-violent patients were held. Plaintiff was then escorted by a law enforcement deputy to the non-violent ward of Copestone.

***FACTS ABOUT MHI CONFINEMENT BEYOND THE ALLOWED TIME – Section G.***

**32.**

Plaintiff's family submitted several requests to MHI demanding that Plaintiff be set free from its MHI's custody. Plaintiff's sister contacted MHI over the phone on more than one occasion and demanded Plaintiff's immediate release into her custody. Plaintiff's brother also called and faxed a letter to MHI demanding that Plaintiff be immediately released into the care of Plaintiff's family. In response to each of those verbal and written requests, MHI refused to release Plaintiff into his family's less restrictive care. "A State cannot constitutionally confine…a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends." O'Connor v. Donaldson, 422 U.S. 563 (1975).

**33.**

Around the 14th day, HD-5, an older tall Caucasian MHI employee who wore purple or blue scrubs, told Plaintiff: *If you keep talking like that, they'll keep you here longer.* Plaintiff learned from that conversation with HD-5 that he should refrain from further expressions of his 1st Amendment rights if he hoped to be released from MHI's custody.

**34.**

Plaintiff also discovered around that time that he must attend group sessions in order to be released. Prior to learning these things from a series of inquiries to various MHI staff, Plaintiff had no idea what was expected of him to be released from the Copestone program because MHI staff neglected to explain the program to Plaintiff upon his admission into the Copestone ward.

**35.**

Plaintiff was held against his will for 16 days at MHI without a lawful continuance, without a subsequent custody order, and without a commitment order. No subsequent custody orders were sought or issued to prolong Plaintiff's confinement. No court commitment hearing was ever held during that time pertaining to Plaintiff's confinement in MHI's Copestone program. No lawful continuances were granted giving MHI permission to hold Plaintiff beyond 10 days.

**36.**

During the 16 days of confinement on MHI's premises, Plaintiff held numerous religious conversations with the patients, nurses and doctors about the Bible, Torah, constitutional law, and even Satanism *(JD was a self-professed devil worshipper)*. Plaintiff remained cordial throughout the experience. Even when another patient tried to provoke him, Plaintiff stayed calm. Plaintiff was not in need of immediate hospitalization, and there was no real emergency. Plaintiff was not in any danger whatsoever until he was seized by the BCS and taken to MHI against his will.

**37.**

Prior to being detained by MHI, Plaintiff was in good health, both mentally and physically. However, as a result of being detained for 16 days in MHI's dangerous environment, Plaintiff's health declined. Plaintiff was released after the 16th day of imprisonment. After Plaintiff was released from MHI's custody, he immediately returned to the place to retrieve his car keys from under the large rock by the flowing stream. Plaintiff went to the parking lot to retrieve car, but was informed by the private guards that his car was towed to a nearby impound. Plaintiff retrieved his car from the tow yard and then drove himself back to Augusta, Georgia.

Plaintiff suffered severe distress and bodily injury as a result of being held captive in MHI's Copestone ward. Plaintiff could not function the same after his detainment in MHI's facility. Plaintiff found the entire experience similar to *The Experiment*, a movie starring Forest Whitaker and Adrien Brody. Plaintiff wrote the same in his exit interview with MHI's admins. However, MHI refused to provide Plaintiff with those records.

To this very day, Plaintiff still battles against fear of forced medications and unreasonable seizures by governmental employees. It took Plaintiff about 2 years to recover and return back to his normal level of functionality after his MHI induced injuries.

After Plaintiff recovered enough to face the impact of those events, Plaintiff requested his medical records from MHI. Once Plaintiff had his medical records and court records in hand, he began to make reasonable inquiries with various law firms to ascertain his available remedies.

### FACTS ABOUT THE RELATIONSHIP BETWEEN MHI AND THE STATE – Section H.

**38.**

"[C]ustody continues with law enforcement until the respondent is, in cases recommending commitment, transferred to a 24-hour facility." McArdle v. Mission Hosp., Inc., 804 S.E.2d 214, (2017). "The state's tactical referral of... medical care to private physicians should not deprive the [patients] of the means to vindicate their Eighth Amendment rights." Conner v. Donnelly, 42 F.3d 220 (4th Cir. 1994). The State of North Carolina provides funding to Missions Hospital, Inc. in order for it to satisfy the state's nondelegable duty to persons confined pursuant to state law:

> **NC Gen. Stat § 122C-2.** Policy. The policy of the State is to assist individuals with needs for mental health, developmental disabilities, and substance abuse services in ways consistent with the dignity, rights, and responsibilities of all North Carolina citizens. Within available resources it is the obligation of State and local government to provide mental health, developmental disabilities, and substance abuse services through a delivery system designed to meet the needs of clients in

the least restrictive, therapeutically most appropriate setting available and to maximize their quality of life. It is further the obligation of State and local government to provide community-based services when such services are appropriate, unopposed by the affected individuals, and can be reasonably accommodated within available resources and taking into account the needs of other persons for mental health, developmental disabilities, and substance abuse services. State and local governments shall develop and maintain a unified system of services centered in area authorities or county programs. The public service system will strive to provide a continuum of services for clients while considering the availability of services in the private sector. Within available resources, State and local government shall ensure that the following core services are available: (1) Screening, assessment, and referral. (2) Emergency services. (3) Service coordination. (4) Consultation, prevention, and education. Within available resources, the State shall provide funding to support services to targeted populations, except that the State and counties shall provide matching funds for entitlement program services as required by law. As used in this Chapter, the phrase "within available resources" means State funds appropriated and non-State funds and other resources appropriated, allocated or otherwise made available for mental health, developmental disabilities, and substance abuse services. The furnishing of services to implement the policy of this section requires the cooperation and financial assistance of counties, the State, and the federal government.

## 39.

At all times relevant hereto, MHI's employees were acting within the scope of their employment with MHI as BC's agents to financially benefit themselves while carrying out the state's policy under N.C. Gen. Stat. §122C-261. By virtue of the powers and privileges granted to MHI and its employees as BC's agents under the state's mental health policy, MHI, RB, and Hospital Does 1-10 unreasonably burdened Plaintiff's religious expression under color of law.

## 40.

BC delegated that function to MHI's employees when the Sheriff took Plaintiff to MHI to have his blood drawn. BC deferred to MHI's professional judgment, despite its recklessness. This analysis is not altered by the fact that MHI and its employees were paid by contract, and were not on the state payroll, nor by the fact MHI and its employees were not required to work exclusively for the State of North Carolina. "It is the physician's function within the state system, not the precise terms of his employment that is determinative." West v. Atkins, 487 U.S. 42 (1988). The Supreme Court held in that case that a private physician providing medical services to incapacitated persons for the State acts under color of state law when treating those persons and is subject to liability under 42 U.S.C. § 1983. The Supreme Court held that a physician's obligation

to provide medical care does not set it at odds with the state. "Instead the physician cooperates with the state and assumes the state's constitutional obligation to provide medical care". *Id.*

**41.**

As a result of MHI and its employees' willful cooperation and close relationship with Buncombe County under North Carolina's Mental Health, Developmental Disabilities, and Substance Abuse Act of 1985, Plaintiff suffered significant injuries and was deprived of his rights and immunities secured by the organic laws for the United States of North America.

**42.**

Whether or not MHI was acting as BC's agent at all times affects not its duties owed to Plaintiff. After MHI assumed full custody of Plaintiff on 9/26/2016, MHI still owed the following duties to Plaintiff: (1) Keep him safe from harm while in its custody; (2) provide Plaintiff with adequate and immediate medical treatment after he was physically injured by another patient; and (3) release Plaintiff from MHI's 24-hour facility as soon as a less restrictive method of treatment became available *(assuming, arguendo, that an IVC was the least restrictive method to begin with).*

## V.  <u>CLAIMS FOR RELIEF</u>

### COUNT I. 42 U.S.C. § 1983 – DEPRIVATION OF RIGHTS UNDER COLOR OF LAW 1ST AMENDMENT VIOLATION. – *See Sections B, C, D, E facts.*

**43.**

To successfully assert a claim under § 1983 Plaintiff must allege two essential elements: (1) the violation of a right secured by the Constitution or Federal laws; and (2) the alleged deprivation was committed by a person acting under color of state law. Plaintiff clearly meets both criteria for bringing a § 1983 claim: (1) he endured a lengthy detainment as punishment for his religious expression, despite being capable of surviving safely in freedom, which was protected by the First Amendment and *O'Connor v. Donaldson*, and (2) the actors who deprived Plaintiff of his liberty were county employees and MHI employees who were acting under county authority.

**44.**

Plaintiff's right to freely exercise his religion to the extent that it doesn't cause harm to himself or others is a clearly established right. "The Fourteenth Amendment, as now applied to the States, protects the citizen against the State itself and all of its creatures…the Fourteenth Amendment [is] an instrument for transmitting the principles of the First Amendment." <u>West Virginia State Board of Education v. Barnette</u>, 319 U.S. 624, 637, 639 (1943).

**45.**

First, there is no doubt that Plaintiff's adherence to Islamism and the teachings of Jesus, Muhammed *(pbuh)*, Buddha, Confucius, and Noble Drew Ali is grounded in sincerely held beliefs. Second, Defendants' actions substantially burdened his religious exercise as explained herein. Third, each defendant lacks evidence, and they won't be able to procure any evidence, that Plaintiff's adherence to his religion was not sincere. Even if Defendants seek to argue that Plaintiff's religious practices were not substantially burdened because they genuinely believed there to be a psychiatric emergency, there were no reasonable grounds for believing that was true.

**46.**

Even if the Defendants seek to argue that Plaintiff's religious practices were not substantially burdened because Plaintiff was naked in the woods of the Biltmore estate, the "State cannot plausibly assert that unbending application of a criminal prohibition... [since it did not] in fact, attempt to enforce that prohibition" Employment Division v. Smith, 494 U.S. 872 (1990).

**47.**

"The state may justify a limitation on religious liberty by showing that it is essential to accomplish an overriding governmental interest" United States v. Lee, 455 U.S. 252 (1982). Here, there was no compelling or overriding state interest at issue; no reasonable safety or health concerns; no public disturbance; no threats of violence, suicide, or danger; and no emergency.

**48.**

A governmental entity is not permitted to involuntarily confine someone based on mere speculation. To justify taking Plaintiff into custody, RB/BC/MHI would have to show that prior to submitting the IVC petition, there was clear and cogent evidence that would have led a reasonable person to believe that, *if left alone or with his family*, Plaintiff would have harmed himself or others. Here, there was no evidence at all that Plaintiff was imminently dangerous to anybody. The officers merely acted on some anonymous complaint that Plaintiff was seen naked in the woods.

**49.**

At all times relevant hereto, BC, RB, and MHI acted in concert to violate Plaintiff's rights secured by the Free Exercise Clause of the 1st Amendment in restricting Plaintiff's freedom of religious speech and punishing Plaintiff for expressing his desire to be nude in nature. The State of North Carolina has a history of misusing "involuntary commitments to fill gaps in its fragmented health system". https://www.ncha.org/2018/06/nc-general-assembly-passes-major-update-to-mental-health-law/

**50.**

Here, Plaintiff was just practicing his religion in nature. Plaintiff was not bothering a soul. Plaintiff published his motto, "nature is my sanctuary", on his social media accounts many years ago and it remains the headline of his Instagram page to this very day. Much like members of the Native American Church, Plaintiff appreciates Allah's design in nature, and often worships there. Just as it is unconstitutional to penalize a Native American for his use of ceremonial peyote, it is also unconstitutional to penalize Plaintiff for his choice to commune with nature on a higher plane.

**51.**

At all times relevant hereto, Plaintiff simply desired to enjoy his vacation and be left alone in peace. At the time of Plaintiff's detainment, he was managing multiple rental properties in Augusta, Georgia and prosecuting a civil suit. Plaintiff had only came to Asheville for a short 3-day vacation. Plaintiff was scheduled to check out of his hotel room on or about 9/21/2016.

**52.**

At no time did Plaintiff act in such a manner as to evidence that, *if left alone in nature or in the care of his family and friends who lived nearby,* he would be unable to satisfy his need for nourishment, personal or medical care, shelter, safety and protection.

**53.**

To deny Plaintiff the benefit of freedom on the basis of his religious expression is to penalize him for his religious expression. Here, RB, the Sheriff's agent, specifically singled out Plaintiff's alleged religious comments as grounds for commencing an involuntary commitment.

**54.**

Plaintiff is informed and believes that each defendant intentionally failed to respect, protect and preserve Plaintiff's constitutional rights and that, at minimum, Defendants were deliberately indifferent to the likely consequence that Plaintiff's rights and interests would be deprived unlawfully, based on their repeated deviations from protocol and past circumstances of similar constitutional and statutory violations of the law. Defendants denied Plaintiff his right to engage in religious expression, including but not limited to religious discussion—an activity that Plaintiff and his friends have peacefully engaged in during previous years around Asheville.

The First Amendment, incorporated and made applicable to the states by the Fourteenth Amendment to the United States Constitution, prohibits censorship of private religious expression. Plaintiff desires to engage in the expressive activities described above on the basis of his sincerely held religious beliefs. BC and MHI's IVC policies and practices chilled, deterred, and restricted

Plaintiff from freely expressing his religious views as it subjected him under a broad interpretation of "normalcy" opined according to the religious views and cultural bias of MHI's physicians.

RB's choice to file an IVC petition against Plaintiff in furtherance of the State's IVC policy substantially burdened Plaintiff's free exercise of religion by conditioning his right to speak and associate according to his sincerely held beliefs and culture. Despite that there were no reasonable grounds for commencing an IVC against Plaintiff, RB willfully and wantonly deviated from the accepted medical standards of her profession in submitting a false affidavit for the Sheriff to deprive Plaintiff of his liberty. RB knew that Plaintiff would be deprived of his liberty as a result of her intentionally false petition. RB demonstrated a complete disregard for the consequences of her actions and expressed no remorse for the harm she caused Plaintiff to endure.

BC and MHI's policy and practice prohibited Plaintiff from engaging in expression based on the religious content and viewpoint of the expression he desires to engage. Plaintiff's religious expression did not materially and substantially interfere with the order and safety of the public. Plaintiff's religious expression did not materially and substantially interfere with safety to self.

BC and MHI's IVC policy and practice of granting unbridled discretion to private physicians to censor Plaintiff's religious expression while permitting Christians, Jews, Nudists, Satanists, and Atheists to engage in unbridled expressions of their faith—also constitutes viewpoint discrimination, which is unconstitutional in any type of forum. This unequal treatment of Plaintiff based on the religious nature of his expression and individuality is a content-based restriction in an otherwise open society for individualized expression.

**55.**

BC and MHI's policies and practices *(particularly RB's IVC petition to have Plaintiff committed on the basis of Plaintiff's religion)* interfered with and denied Plaintiff's ability to freely practice his religion in violation of the Free Exercise Clause of the First Amendment.

**56.**

As a direct and proximate consequence of the acts of BC and MHI's agents and employees in violation of the 1st Amendment to the U.S. Constitution and N.C. Constitution Article I, § 13, Plaintiff suffered and continues to suffer actual and potential injury to his health and reputation and is entitled to compensatory damages for all injuries.

*4TH AMENDMENT VIOLATION. – See Sections D & E facts.*

**57.**

Plaintiff's right to be free of unreasonable searches and seizures is a clearly established right. At all times relevant hereto, Plaintiff was exercising his right to freely practice his religion in the forested area of Biltmore's private property. Plaintiff was not dangerous in any way. The Court's task is to assess whether the facts alleged, taken in the light most favorable to Plaintiff, indicate that the Sheriff had probable cause to seize Plaintiff for a mental evaluation.

"Probable cause is a practical, nontechnical conception that addresses the the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act… P]olice officers must have probable cause to believe that the individual posed a danger to [him]self or others before involuntarily detaining the individual. If probable cause was lacking, then Michael has successfully asserted the violation of a constitutional right — specifically his Fourth Amendment right against unreasonable seizure." <u>Bailey v. Kennedy</u>, 349 F.3d 731, 739 (2003) (internal quotation marks omitted).

"The overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State… [t]he security of one's privacy against arbitrary intrusion by the police as being at the core of the Fourth Amendment and basic to a free society." <u>Schmerber v. California</u>, 384 U.S. 757, 767 (1966) (internal quotation marks omitted).

> "[T]he Fourth Amendment's prohibition is not limited to cases involving arrests… the right to be free of a seizure made without probable cause does not depend upon the character of the subsequent custody… and although the right may overlap somewhat with the right to due process, governmental conduct amounting to seizure of the person must be scrutinized under the more specific rules deriving from the fourth amendment… [I]n the context of seizure of the mentally ill… such a seizure is directly analogous to a criminal arrest and must therefore be supported by probable cause… Put another way, no reasonable police officer could have thought that taking [Plaintiff] against [his] will for a psychiatric evaluation was more akin to a mere investigative *Terry* stop than to a complete seizure by arrest for a state's custodial purposes… At issue, then, is whether plaintiff's behavior at the time of the arrest was sufficient to justify a finding of probable cause for [his] eventual commitment to the Unit… The gravity of the constitutional harm to a person wrongly seized for mental illness lay behind the court's concern for requiring proper procedural and substantive standards before such a seizure… Commitment to an Evaluation Unit, even for a day, involves a loss of liberty, privacy, free association and could well have the effect of creating a stigma against the person confined; such a deprivation can create a stigma of mental illness which can be as debilitating as that of criminal conviction." <u>Gooden v. Howard County Maryland</u>, 917 F.2d 1355 (1990) (internal quotation marks and parentheses omitted).

**58.**

At the time of the arrest, Plaintiff did not exhibit any known symptoms of a mental illness or imminent dangerousness to self or others. There was no reason or justification for the Sheriff to have Plaintiff taken to the hospital for a criminal investigation or psychiatric evaluation.

**59.**

At the time of arrest, the Sheriff knew that Plaintiff was not in need of immediate hospitalization. The Sheriff knew, or should have known, that Plaintiff was capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends. The Sheriff knew, or should have known, that Plaintiff was not in any genuine danger to himself or others. The Sheriff knew, or should have known, that he was required to write and file a report.

**60.**

No reasonable person would have deduced from Plaintiff's nudity, silence, and affirmative sign language that he was suffering from a mental illness. No reasonable person would have deduced from Plaintiff's *lack* of weapons, bruises, and cuts that he was imminently dangerous to himself and others. No reasonable person would have deduced that Plaintiff's non-resistance to the Sheriff's detainment was a sign of public intoxication or indicative of a guilty mind following a commitment of a crime. No reasonable person would have deduced that Plaintiff's meditation in the woods was anything more than the normal freedom-loving behavior of an Asheville hipster.

**61.**

Upon information and belief, the Asheville deputy and the Sheriff intentionally failed to write an incident report about Plaintiff's detainment on and transportation from the Biltmore estate so as to foster ambiguity surrounding the Sheriff's decision to detain Plaintiff under color of law.

**62.**

Upon information and belief, the Sheriff abused his authority in seizing Plaintiff's body and having him transported to MHI without a warrant and without probable cause, in violation of the 4th Amendment to the U.S. Constitution and N.C. Constitution Article I, § 19.

**63.**

Upon information and belief, the Sheriff abused his authority in having HD-1, seize Plaintiff's blood without a search warrant and without probable cause, in violation of the 4th Amendment to the U.S. Constitution. Upon information and belief, because there was no legitimate reason or probable cause to arrest and imprison Plaintiff, and because MHI exercised unlawful control over Plaintiff for the Sheriff prior to the issuance of a custody order, BC is liable for the

false arrest and resulting false imprisonment of Plaintiff. Plaintiff was held against his will and over the objections of his family for a period of 16 days in violation of state and federal law.

**64.**

As a direct and proximate consequence of the acts of BC and MHI's agents and employees in violation of the 4th Amendment to the U.S. Constitution and N.C. Constitution Article I, § 19, Plaintiff suffered and continues to suffer actual and potential injury to his health and reputation and is entitled to compensatory damages for all injuries.

*14TH AMENDMENT VIOLATION OF DUE PROCESS. – See Section G facts.*

**65.**

Pursuant to N.C. Gen. Stat. § 122C-268(a) and (d), Plaintiff's right to a district court hearing within 10 days of the day he was taken into the Sheriff's custody; his right to choose his own counsel to represent him in the matter; and his right to be free from an unconstitutional confinement are all clearly established rights. *See* O'Connor v. Donaldson 422 U.S. 563 (1975).

**66.**

Under state law, MHI owed Plaintiff the following duties, *without limitation:* (1) MHI's first commitment examiner, RB, was required to send a copy of her findings to the clerk of the superior court by the most reliable and expeditious means (N.C. Gen. Stat. § 122C-263(e)); (2) MHI's attending physician, HD-6, was also required to send a copy of her findings to the clerk of the superior court by the most reliable and expeditious means (N.C. Gen. Stat. § 122C-266(c)); and (3) after no hearing or continuance occurred by the 10th day, HD-6 was required to release Plaintiff and notify the clerk of court by the most reliable and expeditious means (N.C. Gen. Stat. § 122C-266(d)). MHI's employees neglected to carry out those required tasks. In failing to perform those tasks, RB and HD-6 breached their duties owed to Plaintiff which caused Plaintiff to be held at MHI for 16 days without a district court hearing in violation of due process.

**67.**

Under state law, BC owed Plaintiff the following duties, *without limitation*: (1) The clerk or magistrate was required to make inquiry as to whether Plaintiff was indigent (N.C. Gen. Stat. § 122C-261(c)); (2) the Clerk of the Superior Court was required to calendar the matter for a hearing in the district court within 10 days of the date Plaintiff was taken into the Sheriff's custody (N.C. Gen. Stat. § 122C-264(b)); (3) the clerk was required to notify Plaintiff of the time and place of the hearing (N.C. Gen. Stat. § 122C-264(b)); and (4) after no continuance or hearing occurred by the 10th day, the clerk was required to terminate the proceedings (N.C. Gen. Stat. § 122C-266(d)).

The clerk and magistrate neglected to carry out those tasks. In failing to perform those tasks, BC breached its duties owed to Plaintiff which caused him to be held for 16 days without a district court hearing, without his choice of counsel, and without being informed of his right to counsel.

### 68.

"To identify the specific dictates of due process under the Due Process Clause, a court must weigh three factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. In the context of involuntary confinement of the mentally ill, due process requires that, even if the "original confinement was founded upon a constitutionally adequate basis ... [confinement cannot] constitutionally continue after that basis no longer exist[s]... Beginning with the first Mathews factor, the Court finds that an individual's interest in avoiding indefinite civil confinement...is substantial. An individual who is unilaterally certified and indefinitely detained...is substantially deprived of his physical liberty... As to the second Mathews factor, the Court finds that an erroneous deprivation of liberty under the Act is likely, if not inevitable. For there to be no likelihood of error in certifying detainees, the Government would have to contend that its certification process was error proof, an impossibility, and, if it were error proof, there would be no purpose in judicial review." United States v. Timms, 799 F. Supp. 2d 582, 593-94 (E.D.N.C. 2011) (internal quotations and citations omitted).

### 69.

Here, Defendant RB, acting as the Sheriff's agent, unilaterally filed an affidavit certifying that Plaintiff fit the criteria for an involuntary commitment (*immediate hospitalization not necessary*). As a result of her petition (which was devoid of evidence), Plaintiff was held for 16 days in MHI's Copestone ward, in violation of the 14th Amendment to the U.S. Constitution. No timely continuance, subsequent custody order, or commitment order was ever issued by the Court.

### 70.

As a direct and proximate consequence of the acts of BC and MHI's agents and employees in violation of the 14th Amendment to the U.S. Constitution and N.C. Constitution Article, §§ 21 and 36, Plaintiff suffered and continues to suffer actual and potential injury to his health and reputation and is entitled to compensatory damages for all injuries to his person.

## COUNT II. ASSAULT & BATTERY – *See* Section F facts

### 71.

At all relevant times, Plaintiff did not consent to any physical contact by the Defendants; and Plaintiff was justifiably apprehensive that Defendants' contact may cause him physical harm.

### 72.

Without justifiable reason or medical procedure for doing so, HD-3 and HD-4 deliberately, and for the purpose of intentionally inflicting emotional distress upon Plaintiff, pinned his body to the ground and forcefully administered a heavy sedative into Plaintiff's veins while Plaintiff was in *time-out* – already isolated from others. Plaintiff stated three times aloud: "I do not consent". Shortly after, the MHI's heavy sedative took effect and Plaintiff loss consciousness. MHI's employees did not have any reasonable grounds or justification to forcefully medicate Plaintiff.

### 73.

After Plaintiff was confined in MHI's custody exceeding 10 days, JD deliberately punched Plaintiff in the face. As a result of JD's attack on Plaintiff, Plaintiff's eye bled profusely. Plaintiff did not solicit, provoke, or desire such physical attacks from JD.

### 74.

Each defendant's unwanted contact caused Plaintiff to suffer physical and emotional harm. Defendants' conduct constituted separate and distinct counts of assault and battery on Plaintiff. Upon information and belief, the defendants acted together in a concerted effort to cause Plaintiff harm. As a result of the assaults and batteries, Plaintiff suffered permanent damages.

## COUNT III. GROSS NEGLIGENCE – *See* Section A through H facts

### 75.

Plaintiff incorporates by reference all of the above as if fully restated in this paragraph.

### 76.

"An act or conduct rises to the level of gross negligence when the act is done purposely and with knowledge that such act is a breach of duty to others" <u>Boryla-Lett v. Psychiatric Solutions of N.C., Inc.</u>, 685 S.E.2d 14, 19 (N.C. Ct. App. 2009). At all times relevant hereto, the Sheriff, RB, and Hospital Does 1-10, knew, or should have known that they each owed Plaintiff a duty to adhere to the required protocols for a non-emergency IVC. In breach of their duties and Plaintiff's rights, each defendant intentionally disregarded the required protocols and caused Plaintiff harm. A county can be sued directly under § 1983 pursuant to a governmental custom even if "such a

custom has not received formal approval through the body's official decisionmaking channels."
Carpenter v. Trammel, CIVIL CASE NO. 1:18-cv-00016-MR-WCM (W.D.N.C. May. 13, 2019).

**77.**

Upon information and belief, Plaintiff's injuries were caused by BC and MHI's policy, pattern, or custom of inadequately training its employees *and supervising* on the required procedures of an IVC. As Plaintiff will show with the evidence introduced through the framework of this complaint, insha'Allah, there are several prior instances wherein BC and MHI's employees failed to adhere to the required IVC protocols.

For example, on numerous occasions: (1) the Sheriff failed to write a report showing probable cause existed to arrest a person and take him to MHI for a psychiatric evaluation; (2) the Sheriff failed to make certain disclosures required by N.C. Gen. Stat. § 122C-251(c); (3) MHI's employees failed to comply with accepted medical standards and state law in their involuntary treatments and examinations; (4) MHI's commitment examiners failed to provide specific information to their patients as required by N.C. Gen. Stat. § 122C-263(g); and (5) although BC and MHI knew of these repeated deviations from required protocols, BC/MHI repeatedly refused to take corrective action to prevent the foreseeable risk of harm posed thereby.

BC/MHI's decision to perpetuate its custom of inadequate mental health employee training is the primary factor, or moving force, that caused the violation of Plaintiff's constitutional rights.

**78.**

Prior to the State's issuance of a 7-day temporary custody order, HD-1 had a legal duty to obtain Plaintiff's consent or a search warrant to draw his blood. HD-1 had a duty to inform Plaintiff of sufficient facts to enable him to intelligently consent to any pre-custody order treatments. HD-1 failed to obtain Plaintiff's consent to treatment, or in the alternative knew, or should have known that Plaintiff was not consenting and/or revoked his consent for treatment, including without limitation, treatment for an alleged mental illness.

**79.**

At all times, HD-1 knew, or should have known that she owed Plaintiff duty to adhere to the required protocols for obtaining consent in a non-emergency situation. Despite knowing her duty, HD-1 intentionally disregarded her duty owed to Plaintiff and took his blood, over his verbal objections. Plaintiff specifically told HD-1 that he did not consent to any blood draw prior to HD-1 drawing his blood. HD-1's failure to obtain consent or a warrant displays her willingness to disregard Plaintiff's right to not have his life-blood taken in a non-emergency situation.

**80.**

On 9/20/2016, sometime in between the moment Plaintiff was arrested and RB's alleged first examination, HD-2 secretly tranquilized Plaintiff without his consent. MHI's heavy sedative administered into Plaintiff's bloodstream which disoriented Plaintiff and caused him to lose consciousness. HD-2 failed to obtain Plaintiff's consent, or in the alternative knew, or should have known, that Plaintiff was not consenting and/or revoked his consent for sedation, including without limitation, sedation for failing to cooperate with labs or eat hospital food. HD-2 knew or should have known that Plaintiff would not agree to such forced medication. HD-2's willful sedation of Plaintiff without reason or justification fails to comport with accepted medical standards.

**81.**

At all times, HD-2 knew, or should have known that he owed Plaintiff a duty to adhere to the required protocols for forcefully medicating Plaintiff in a non-emergency situation. Despite knowing his duty, HD-2 intentionally disregarded his duty owed to Plaintiff and sedated him without his consent or knowledge. HD-2's wantonly sedated Plaintiff because of his religious expressions and for no other reason. HD-2 failed to comport with professional standards.

**82.**

After that, RB entered Plaintiff's room without his consent and allegedly conducted a first examination while Plaintiff was still in bed. This occurred on 9/20/16 at or about 11:01 PM.

**83.**

At all times relevant, there was no emergency that existed which could have excused Defendants' lack of consent. HD-1 and HD-2 did not disclose to Plaintiff the risks of such treatments and did not respect Plaintiff's aversion to needles or European pharmaceuticals entering his body. MHI's wantonly disregarded the material risk that such involuntary treatments, *without appropriate justification*, may violate Plaintiff's religious beliefs. The Moorish American's position of not submitting to European medical treatments or consuming poisonous foods is publicly known. "[T]he materiality test promotes the paramount purpose of the informed consent doctrine — to vindicate the patient's right to determine what shall be done with his own body and when… A material risk is one which a physician knows or ought to know would be significant to a reasonable person in the patient's position in deciding whether or not to submit to a particular medical treatment or procedure." Lipscomb v. Memorial Hosp, 733 F.2d 332, 336 (4th Cir. 1984)

**84.**

As a result of RB, HD-1, and HD-2's willful misconduct, Plaintiff suffered emotional distress. Their wrongful acts were reckless which entitles Plaintiff to punitive damages.

**85.**

At all times relevant hereto, RB's supervisor, HD-7, knew, or had reason to know that RB was an incompetent employee. HD-7 knew, or should have known that because of RB's history of providing inadequate medical treatment and failing to follow procedures, RB was likely to cause injury to Plaintiff or others. HD-7 knew that RB was unfit to conduct commitment examinations for the State of North Carolina. "North Carolina recognizes a cause of action for negligent supervision and retention as an independent tort based on the employer's liability to third parties." Smith v. Privette, 128 N.C. App. 490, 494 (N.C. Ct. App. 1998).

**86.**

Prior to RB's tortious act of allegedly examining Plaintiff for commitment without a custody order and while he was sedated in bed, HD-7, knew or had to reason to know that RB was an incompetent commitment examiner as she was unable to follow the required protocol of the IVC Affidavit/Petition. HD-7 intentionally disregarded RB's recklessness in basing her opinion of the IVC petition/affidavit on conclusions and hearsay. HD-7 knew of RB's incompetence, but failed to properly train and supervise RB to work as a commitment examiner. HD-7 displayed a complete lack of care in correcting RB's inadequacies. HD-7 knew, or should have known that RB had used such inadequate methods for commitment in the past. Despite knowing that RB posed a risk of depriving patients of their constitutional rights, HD-7 continued to allow RB to continue act as a commitment examiner. Due to HD-7's inaction, RB was allowed to ***copy/paste*** her false conclusions into the first examination form which misled the magistrate in issuing a custody order.

**87.**

At all times relevant hereto, there was a special relationship between MHI and JD. JD was HD-8's patient and HD-8 knew, or should have known of JD's violent propensities. HD-8 and other members of MHI's staff had the ability and opportunity to control JD at the time of his criminal acts against Plaintiff, but instead of doing so, they sat back and let JD attack Plaintiff. A finding that a special relationship exists and imposes a duty to control is justified where "(1) the defendant knows or should know of the third person's violent propensities *and* (2) the defendant has the ability and opportunity to control the third person at the time of the third person's criminal acts." McArdle v. Mission Hosp., Inc., 804 S.E.2d 214, 218 (N.C. Ct. App. 2017).

**88.**

While watching the events that led up to JD punching Plaintiff in the eye, HD-3 knew that Plaintiff was at risk of harm but breached its duty to protect Plaintiff from the foreseeable harm that JD imposed on Plaintiff by punching him in his eye. Further, after Plaintiff was seriously

injured by that punch and in need of medical attention, MHI's staff was deliberately indifferent to Plaintiff's medical needs as they denied Plaintiff meaningful medical treatment for his injuries. "In order to establish a claim of deliberate indifference to a medical need, the need must be both apparent and serious, and the denial must be both deliberate and without legitimate penological objective." Brown v. Brunden, NO. 5:12-CT-3215-FL, 3 (E.D.N.C. May. 31, 2013).

**89.**

Plaintiff is informed and believes, and on that basis alleges that each employee of BC and MHI who were involved in Plaintiff's involuntary treatment and confinement acted pursuant to and within the scope of the relationships alleged above, that BC and MHI authorized, ratified, adopted, conspired, approved, controlled, encouraged, and/or aided and abetted each employee's willful misconduct. BC/MHI is vicariously liable for injuries to Plaintiff's reputation and person.

## VI.   STANDARD OF LIABILITY

**90.**

The Sheriff, RB, and Hospital Does 1-10 knew, or should have known that they owed Plaintiff a duty of care conforming to professional standards. Despite knowing this, they each intentionally violated Plaintiff's rights by willfully deviating from required protocols which caused Plaintiff harm. Defendants breached that duty of care owed to Plaintiff by deliberately performing unnecessary treatments on Plaintiff and intentionally failing to disclose to Plaintiff any and all information that could have apprised him of the "next steps" of the IVC process. Had Plaintiff been apprised of those facts throughout the proceeding, Plaintiff would have gained insight into the situation a lot sooner. As a result of their breaches of duty, Plaintiff suffered damages, including but not limited to: physical harm, embarrassment, emotional distress, and mental pain and suffering. Defendants' conduct was malicious and/or in reckless disregard of Plaintiff, and Plaintiff is entitled to general damages, special damages, exemplary damages, and treble damages.

**91.**

At the time of Plaintiff's arrest, any "facility or any of its officials, staff, or employees, or any physician or other individual who is responsible for the custody, examination, management, supervision, treatment, or release of a client and [who fails to follow] accepted professional judgment, practice, and standards is civilly liable, personally or otherwise, for actions arising from these responsibilities or for actions of the client." N.C. Gen. Stat. § 122C-210.1.

After Plaintiff filed by mail his original pleading, the statute was changed to any "facility, person, or entity... an acute care hospital, a general hospital, an area authority, a law enforcement

officer... or any of their officials, staff, or employees...who is responsible for the custody, transportation, examination, admission, management, supervision, treatment, or release of a respondent or client and who is... grossly negligent, is civilly or criminally liable, personally or otherwise, for that person's or entity's actions or omissions arising from these responsibilities or for the actions or omissions of a respondent or client. N.C. Gen. Stat. § 122C-210.1.

**92.**

Plaintiff was not negligent in any way and did ***not*** cause his own injuries.

## VII.    CONCLUSION

At trial, Plaintiff intends to show to the enlightened conscience of an American jury that Defendants, under color of law, directly and proximately caused Plaintiff's false imprisonment/arrest without probable cause ($250,000.00); bodily injuries from the assaults and batteries ($160,000.00); past and future medical expenses ($75,000.00), and other non-economic damages. Plaintiff is also entitled to punitive damages in the amount of ($2,000,000.00).

### *IMPORTANT NOTE*

On January 17, 2019, the attorney who was appointed to represent Plaintiff without his consent, Timothy Henderson, also provided written notice to Defendants that Plaintiff could bring subsequent litigation. "[W]hether a complaint will relate back...depends upon whether that new defendant had notice of the claim... If some nexus among defendants will permit the trial judge to infer that the new defendant had notice of the original claim so as not to be prejudiced by the amendment, Rule 15(c) will allow a complaint to be amended so as to add a new party. Huggard v. Wake County Hospital System, 102 N.C. App. 772, 776 (N.C. Ct. App. 1991). "Notice to and knowledge of an authorized agent is imputed to the principal even [if] the agent does not inform the principal thereof." Passmore v. Woodard, 37 N.C. App. 535, 541 (1978).

**The "law of the land" requires that the administration of justice be consistent with fundamental principles of liberty and justice.** State v. Tolley, 290 N.C. 3(9 1796) ☐

### MOORISH AMERICAN PRAYER

Allah the Father of the Universe, the Father of Love, Truth, Peace, Freedom and Justice. Allah is my protector, my guide, and my salvation by night and by day, through his Holy Prophet, DREW ALI. "Amen".

**WHEREFORE**, Plaintiff moves this Court to reconsider its judgment under the principles of equitable tolling. Plaintiff demands monetary compensation and moves this Court to enter judgment in his favor and:

a.  That summons issue for County of Buncombe and summons by publication be permitted for Defendant John Doe requiring them both to appear in this Court within the time prescribed by law and answer this Complaint;

b.  That all Defendants are jointly and severally liable;

c.  For an order requiring the destruction of all records arising from this matter;

d.  For general, special, punitive damage, and treble damages where applicable;

e.  For costs of this suit including fees under 42 USC 1988;

f.  Trial by jury of twelve (12) true Americans;

g.  For an order granting Plaintiff's motion for reconsideration/equitable tolling; and

h.  Any other relief this Court deems fair and just.

Executed in good faith this _18_ day of February 2020 A.D.

Plaintiff's Signature
c/o TAQI EL AGABEY MANAGEMENT
30 N. Gould Street, Suite R
Sheridan, WY 82801
Ph: (678) 467-1049
teamwork3620@gmail.com

## VERIFICATION

STATE OF GEORGIA

COUNTY OF _Fulton_

Personally appeared before the undersigned officer duly authorized by law to administer oaths, Plaintiff Bro T. Hesed-El, who after being duly sworn under oath or affirmation, certifies, declares, deposes and states that the foregoing is this Amended Complaint is true and correct to the best of his knowledge belief.

Respectfully this _18_ day of _February_ 2020.

Plaintiff's Signature

Sworn and subscribed before me this
_18_ day of _February_ 2020.

NOTARY PUBLIC

*[Notary seal: AMETHYST FERGUSON NOTARY PUBLIC GEORGIA FULTON COUNTY EXPIRES 05-05-2023]*