# ATTACHMENT

# 2ND AMENDED COMPLAINT

51 pages attached

# UNITED STATES DISTRICT COURT

for the

Western District of North Carolina ▾

Asheville Division

RECEIVED
ASHEVILLE, N.C.

APR 13 2020

Clerk, U.S. Dist. Court
W. Dist. of N.C.

BRO. T. HESED-EL

_____

*Plaintiff(s)*
*(Write the full name of each plaintiff who is filing this complaint.*
*If the names of all the plaintiffs cannot fit in the space above,*
*please write "see attached" in the space and attach an additional*
*page with the full list of names.)*

-v-

JOHN DOE, et al.,

_____

*Defendant(s)*
*(Write the full name of each defendant who is being sued. If the*
*names of all the defendants cannot fit in the space above, please*
*write "see attached" in the space and attach an additional page*
*with the full list of names. Do not include addresses here.)*

)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. CV 119-285
_____
*(to be filled in by the Clerk's Office)*

Jury Trial: *(check one)* ☑ Yes ☐ No

*✱ Amendment Relates*
*Back to October 7, 2019*
*Filing. Plaintiff was not*
*at liberty to sue until*
*after October 5, 2016.*

## 2ND AMENDED
## COMPLAINT FOR VIOLATION OF CIVIL RIGHTS
### (Non-Prisoner Complaint)

### NOTICE

Federal Rules of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number.

Except as noted in this form, plaintiff need not send exhibits, affidavits, grievance or witness statements, or any other materials to the Clerk's Office with this complaint.

In order for your complaint to be filed, it must be accompanied by the filing fee or an application to proceed in forma pauperis.

Under FRCP Rule 15(c), this amendment relates back to Plaintiff's
timely original complaint filed on October 7, 2019.

## I. The Parties to This Complaint

### A. The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

| | |
|---|---|
| Name | Bro. T. Hesed-El |
| Address | c/o TAQI EL AGABEY MGMT, 30 N Gould Street, Suite R |
| | Sheridan WY 82801 |
| | *City* *State* *Zip Code* |
| County | Sheridan |
| Telephone Number | 762-333-2075 |
| E-Mail Address | teamwork3@gmail.com |

### B. The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title (if known) and check whether you are bringing this complaint against them in their individual capacity or official capacity, or both. Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | John Doe |
| Job or Title *(if known)* | |
| Address | |
| | *City* *State* *Zip Code* |
| County | Buncombe County |
| Telephone Number | |
| E-Mail Address *(if known)* | |

[X] Individual capacity    [ ] Official capacity

Defendant No. 2

| | |
|---|---|
| Name | Robin Bryson |
| Job or Title *(if known)* | Licensed Clinical Social Worker |
| Address | 428 Biltmore Avenue |
| | Asheville NC 28801 |
| | *City* *State* *Zip Code* |
| County | Buncombe |
| Telephone Number | |
| E-Mail Address *(if known)* | |

[x] Individual capacity    [x] Official capacity

Defendant No. 3

| | |
|---|---|
| Name | Jack Van Duncan |
| Job or Title *(if known)* | Former Sheriff of Buncombe County |
| Address | 43 Blue Ridge Acres Rd |

| Asheville | NC | 28806 |
|---|---|---|
| *City* | *State* | *Zip Code* |

| | |
|---|---|
| County | Buncombe County |
| Telephone Number | |
| E-Mail Address *(if known)* | |

[×] Individual capacity    [×] Official capacity

Defendant No. 4

| | |
|---|---|
| Name | Quentin Miller |
| Job or Title *(if known)* | Sheriff of Buncombe County |
| Address | 202 Haywood Street, 4th Floor |

| Asheville | NC | 28801 |
|---|---|---|
| *City* | *State* | *Zip Code* |

| | |
|---|---|
| County | Buncombe County |
| Telephone Number | |
| E-Mail Address *(if known)* | |

[ ] Individual capacity    [×] Official capacity

## II.  Basis for Jurisdiction

Under 42 U.S.C. § 1983, you may sue state or local officials for the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." Under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971)*, you may sue federal officials for the violation of certain constitutional rights.

A.    Are you bringing suit against *(check all that apply)*:

[ ] Federal officials (a *Bivens* claim)

[✓] State or local officials (a § 1983 claim)

B.    Section 1983 allows claims alleging the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." 42 U.S.C. § 1983. If you are suing under section 1983, what federal constitutional or statutory right(s) do you claim is/are being violated by state or local officials?

Violation of 1st, 4th, 8th, and 14th amendments to the U.S. Constitution; and related state tort claims.

C.    Plaintiffs suing under *Bivens* may only recover for the violation of certain constitutional rights. If you are suing under *Bivens*, what constitutional right(s) do you claim is/are being violated by federal officials?

D.  Section 1983 allows defendants to be found liable only when they have acted "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia." 42 U.S.C. § 1983. If you are suing under section 1983, explain how each defendant acted under color of state or local law. If you are suing under *Bivens*, explain how each defendant acted under color of federal law. Attach additional pages if needed.

Plaintiff's rights are clearly established. Under color of law, the defendants knowingly violated Plaintiff's freedom of religion, right to be safe from unreasonable seizures, and his right to liberty. The defendants knew that Plaintiff did not meet the critera for an IVC but confined him for 16 days anyways. The defendants intentionally inflicted emotional distress upon Plaintiff based on their religious bias and reckless indifference to his rights. See attachment. See O'Connor v. Donaldson, 422 U.S. 583 (1975).

## III.  Statement of Claim

State as briefly as possible the facts of your case. Describe how each defendant was personally involved in the alleged wrongful action, along with the dates and locations of all relevant events. You may wish to include further details such as the names of other persons involved in the events giving rise to your claims. Do not cite any cases or statutes. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

A.  Where did the events giving rise to your claim(s) occur?

Biltmore Estate and Mission Hospital

See attached.

B.  What date and approximate time did the events giving rise to your claim(s) occur?

09/20/2016 @ 1pm thru 10/06/2016 @ 5pm.

See attached.

C.  What are the facts underlying your claim(s)? *(For example: What happened to you? Who did what? Was anyone else involved? Who else saw what happened?)*

At the time of Plaintiff's arrest, Plaintiff was not mentally ill; Plaintiff was not dangerous to self; and Plaintiff was not dangerous to others. The defendants willfully violated required state IVC protocol and violated Plaintiff's clearly established rights in seeking to have Plaintiff treated without cause and against his will under the most restrictive means available.

See attached.

\*Important Note - Plaintiff was not at liberty to sue until after he was released from the Defendants' custody on October 5, 2016. Under the general state rule for accrual, Plaintiff had until October 7, 2019 to file suit given the fact that October 5, 2019 fell on a Saturday.

## IV. Injuries

If you sustained injuries related to the events alleged above, describe your injuries and state what medical treatment, if any, you required and did or did not receive.

Plaintiff suffered permanent physical injuries. Plaintiff also suffered extensive emotional distress and harm.

See attached.

## V. Relief

State briefly what you want the court to do for you. Make no legal arguments. Do not cite any cases or statutes. If requesting money damages, include the amounts of any actual damages and/or punitive damages claimed for the acts alleged. Explain the basis for these claims.

Plaintiff demands monetary compensation and the complete expungement of all records of the IVC proceedings.

See attached.

## VI. Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A. For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:      04/10/2020

Signature of Plaintiff

Printed Name of Plaintiff    BRO. T. HESED-EL

### B. For Attorneys

Date of signing:

Signature of Attorney

Printed Name of Attorney

Bar Number

Name of Law Firm

Address

| | City | State | Zip Code |
|---|---|---|---|

Telephone Number

E-mail Address

RECEIVED
ASHEVILLE, N.C.

APR 13 2020

Clerk, U.S. Dist. Court
W. Dist. of N.C.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA

BRO. T. HESED-EL,                              )
                                               )
                    Plaintiff,                 )       Civil Action No. CV 119-285
v.                                             )
                                               )
JOHN DOE, et al.,                              )
                                               )
                    Defendants.                )

## COMPLAINT ATTACHMENT

Surah 4:148
Allah does not like the public mention of evil except by one to whom injustice has been
done; And ever is Allah Hearing and Knowing.

**COMES NOW,** Plaintiff *pro se* Bro. T. Hesed-El ("Plaintiff"), in good faith, to recover
damages from John Doe ("JD"), Robin Bryson ("RB"), Jack Van Duncan ("JVD"), Quentin Miller
("QM"), Mission Hospital, Inc. ("MHI"), Hospital Does 1-10 ("HD"), County of Buncombe
("BC"), and Western Surety Company ("Surety"), collectively ("Defendants"). Plaintiff demands
a trial by a jury of his national peers. Plaintiff respectfully shows the Court as follows:

## I.    INTRODUCTION

What is it about mankind that drives it to put people in boxes?
https://www.youtube.com/watch?v=jD8tjhVO1Tc&feature=youtu.be

This §1983 action arises out of BC's malicious and corrupt misuse of the IVC process to
unlawfully deprive Plaintiff of his liberty. Here, Plaintiff was confined in MHI's unsafe
environment for 16 days based on RB's false affidavit. In her IVC petition, RB falsely swore that
she had first-hand knowledge that Plaintiff was suffering from a mental illness. Mental illness
means "an illness which so lessens the capacity of the individual to use self-control, judgment, and
discretion in the conduct of his affairs and social relations as to make it necessary or advisable for
him to be under treatment, care, supervision, guidance, or control." N.C. Gen. Stat. § 122C-3(21).

As will be shown through the framework of this complaint, insha'Allah, RB's opinion was not
based on any facts or accepted medical standards for imminent dangerousness; but instead, her
opinion was solely based on her religious bias. "Preoccupation with religion is insufficient to
support a finding of mental illness." In Matter of Trice, 706 S.E.2d 841, 6 (N.C. Ct. App. 2010).

— ♡ —

Thus, Plaintiff should not have been subjected to forced medications; mental health examinations; an assault/battery by another patient; and a 16-day confinement without a 10-day court hearing.

Plaintiff was "denied his right to a hearing before the district court within ten days of confinement [N.C. Gen. Stat. § 122C-268(a)]... The statute indicates a conscious legislative decision to place the burden on the State to come forward with evidence to justify the commitment within 10 days... taking a person without the intervention of any court proceeding is a drastic procedure." In re Jacobs, 38 N.C. App. 573, (N.C. Ct. App. 1978). As a result of Defendants' willful misconduct, Plaintiff suffered bodily harm, mental anguish and emotional harm. Defendants' purposely and *continually* violated Plaintiff's rights from 09/202016 to 10/6/2016.

## II.    NOTICE TO THE FACTFINDER

**TAKE NOTICE** that this complaint is based on Plaintiff's present understanding of the law. It should not be construed as knowledge of the defendants' violations at the time of confinement. On 09/20/2016, unknown persons arrested Plaintiff on private property. At that time, Plaintiff thought he was being charged with trespassing or indecent exposure. The arresting persons didn't Mirandize Plaintiff or inform him of any pending psychiatric evaluation. Plaintiff did not know his rights were violated at the time of his arrest. Plaintiff discovered the violations after the court's records were released on 01/17/2019. Prior to that, Plaintiff was completely ignorant to the fact that the County was the moving force behind the IVC. Prior to Jan. 2019, Plaintiff was under the impression that MHI and RB were the ones who changed a criminal arrest into an IVC proceeding.

**TAKE NOTICE** that this suit is not about the false and contradictory findings that MHI's staff wrote in their examinations, psychiatric notes, and secret interviews. This action is about their reckless disregard of required IVC protocols and Plaintiff's well-being, rights, interests, and safety.

**TAKE NOTICE** that no commitment hearing was ever held in this matter and Plaintiff is not challenging a state-court decision. The Rooker-Feldman doctrine is inapplicable to this case.

**TAKE NOTICE** that while in their custody, the legal injuries of defendants' violations were not readily apparent. While in their custody, Plaintiff was not served with any notice of a pending commitment hearing in the state district court; Defendants did not provide Plaintiff with sufficient information about the IVC procedures so that he could make any informed decisions; Plaintiff was deprived of his choice of counsel to represent him; and Plaintiff was not informed of his right to counsel in the matter. The IVC records were sealed by BC's Special Proceedings division.

**TAKE NOTICE** that because of the pain and needless treatments inflicted upon Plaintiff while in their custody, Plaintiff suffered from severe emotional distress. It took Plaintiff a significant amount of time to recuperate from the trauma caused by the assault and MHI's forced medication.

**TAKE NOTICE** that no commitment order was ever issued in this matter. At all relevant times, Plaintiff was exercising his rights *and* practicing his religion in a way that posed no threat of harm or danger to himself or others. At all times relevant, BC, MHI, and their representatives were rendering assistance during a non-emergency, and based on their opinions that Plaintiff's sincerely held religious beliefs and caution against overreaching governments are "grandiose", "delusional", and "paranoid", Plaintiff was confined at MHI for 16 days in violation of law.

**TAKE NOTICE** that when the court-appointed attorney allegedly interviewed Plaintiff in 2016, he did not provide Plaintiff with any copies of court documents.

The critical question now before the Court is whether RB was acting as an agent of the County in swearing out the IVC petition to have Plaintiff involuntarily committed, and in doing so, whether the County sought the least restrictive means of achieving a compelling or overriding state interest.

### III.    JURISDICTION & VENUE

1. **Plaintiff Bro. T. Hesed-El** is a Moorish-American Moslem governed under the divine Laws of the Holy Koran of Mecca, Love, Truth, Peace, Freedom and Justice. Plaintiff, a natural person, is A CITIZEN OF THE U.S.A. According to 28 U.S.C. §§ 1331, 1332, 1343 and 1367, Plaintiff brings this action to vindicate his rights secured by the 1st, 4th, and 14th amendments. Plaintiff is not a citizen of the State of North Carolina and is not subject to its jurisdiction.

2. **Defendant John Doe**, upon information and belief, is subject to the jurisdiction and venue of the Court. Defendant JD is the MHI patient who purposely assaulted Plaintiff while in MHI's care and custody. JD is a citizen of North Carolina. JD's address is not known at this time due to MHI's concealment of records. Plaintiff reserves his right to amend this complaint after discovery.

3. **Defendant Robin Bryson**, upon information and belief, is subject to the jurisdiction and venue of the Court. Defendant RB is a Licensed Clinical Social Worker under contract with the State of North Carolina. RB is also gainfully employed by MHI and an agent of the County. RB earned money through her job at MHI by cooperating with the County to provide inadequate

medical care to Plaintiff as alleged herein. RB is a citizen of the State of North Carolina and can be served with court process at her current address: 428 Biltmore Avenue, Asheville, NC 28801.

4.      **Defendant Jack Van Duncan,** upon information and belief, is subject to the jurisdiction and venue of the Court. Defendant JVD is the former Sheriff of Buncombe County. JVD is a citizen of the State of North Carolina and can be served with court process at his current address: 43 Blue Ridge Acres Rd., Asheville, NC 28806.

5.      **Defendant Quentin Miller,** a North Carolina citizen, is subject to the jurisdiction and venue of the Court. Defendant QM is the Sheriff of Buncombe County and can be served with court process at his current address: 202 Haywood Street, 4th Floor, Asheville, NC 28801.

6.      **Defendant County of Buncombe**, upon information and belief, is subject to the jurisdiction and venue of the Court. Defendant BC is a political subdivision of the State of North Carolina. BC may be served with process through its County Manager, Avril Pender, at 200 College Street, Suite 300, Asheville, NC 28801.

7.      **Defendant Western Surety Company**, upon information and belief, is a South Dakota corporation and the surety on JVD's bond (#14918421); it is subject to the jurisdiction and venue of the Court; Surety is the liability insurance provider for the County, JVD, and QM; they were collectively insured in excess of $1,000,000; and covered during their various torts and violations.

8.      **Defendant Mission Hospital, Inc.,** upon information and belief, is subject to the jurisdiction and venue of the Court. Defendant MHI, an agent of the County, is a Christian-based hospital organized as a non-profit corporation under the laws of the State of North Carolina. MHI is located at 509 Biltmore Ave, Asheville, NC 28801. MHI may be served with process through its agent, Corporation Service Company, at 2626 Glenwood Ave, Suite 550, Raleigh, NC 27608.

\*\*Defendant JVD, Defendant QM, and Defendant Surety were each notified of the original pleadings within the applicable limitations period through their respective agent(s) or principal.

## IV.    **ALLEGED FACTS**

9.      Pursuant to FRCP Rule 10(c), Plaintiff incorporates by reference the attached Affidavit in Support, as if fully stated in this paragraph, setting forth the facts in support of the claims for relief. The attached affidavit is integral to this complaint and must be considered as part of the pleadings.

# V.   CLAIMS FOR RELIEF

## COUNT I. 42 U.S.C. § 1983 – DEPRIVATION OF RIGHTS UNDER COLOR OF LAW
### *1ST AMENDMENT VIOLATION. – See Sections B, C, D, E facts of Affidavit.*
*This count is against all defendants except Defendants JD and Surety*

**10.**     To successfully assert a claim under § 1983 Plaintiff must allege two essential elements: (1) the violation of a right secured by the Constitution or Federal laws; and (2) the alleged deprivation was committed by a person acting under color of state law. Plaintiff clearly meets both criteria for bringing a § 1983 claim: (1) he endured a lengthy detainment as punishment for his religious expression, despite being capable of surviving safely in freedom, which was protected by the First Amendment and *O'Connor v. Donaldson*; and (2) the actors who deprived Plaintiff of his liberty were county employees and MHI employees who were acting under color of state law.

**11.**     Plaintiff's right to freely exercise his religion is a clearly established right. "The Fourteenth Amendment, as now applied to the States, protects the citizen against the State itself and all of its creatures…the Fourteenth Amendment [is] an instrument for transmitting the principles of the First Amendment." West Virginia State Board of Education v. Barnette, 319 U.S. 624, 637, 639 (1943).

**12.**     First, there is no doubt that Plaintiff's adherence to Islamism and the teachings of Jesus, Muhammed *(pbuh)*, Buddha, Confucius, and Noble Drew Ali is grounded in sincerely held beliefs. Second, Defendants' actions substantially burdened his religious exercise as explained herein. Third, each defendant lacks evidence, and they won't be able to procure any evidence, that Plaintiff's adherence to his religion was not sincere. Even if Defendants seek to argue that Plaintiff's religious practices were not substantially burdened because they genuinely believed there to be a psychiatric emergency, there were no reasonable grounds for believing that was true.

**13.**     Even if the Defendants seek to argue that Plaintiff's religious practices were not substantially burdened because Plaintiff was naked in the woods of the Biltmore Estate, the "State cannot plausibly assert that unbending application of a criminal prohibition… [since it did not] in fact, attempt to enforce that prohibition" Employment Division v. Smith, 494 U.S. 872 (1990).

**14.**     "The state may justify a limitation on religious liberty by showing that it is essential to accomplish an overriding governmental interest" United States v. Lee, 455 U.S. 252 (1982). Here,

there was no compelling or overriding state interest at issue; no reasonable safety or health concerns; no public disturbance; no threats of violence, suicide, or danger; and no emergency.

15.     A governmental entity is not permitted to involuntarily confine someone based on mere speculation. To justify taking Plaintiff into custody, Defendants would have to show that prior to submitting the IVC petition, there was clear and cogent evidence that would have led a reasonable person to believe that, *if left alone or with his family*, Plaintiff would have harmed himself or others. Here, there was no evidence at all that Plaintiff was imminently dangerous to anybody. The officers merely acted on some anonymous tip that Plaintiff was strangely naked in the woods.

16.     At all times relevant hereto, Defendants acted in concert to violate Plaintiff's rights secured by the Free Exercise Clause of the 1st Amendment in restricting Plaintiff's freedom of religious speech and punishing Plaintiff for expressing his personal desire to be nude in nature. The State of North Carolina has a history of misusing "involuntary commitments to fill gaps in its fragmented health system". https://www.ncha.org/2018/06/nc-general-assembly-passes-major-update-to-mental-health-law/

17.     Here, Plaintiff was just practicing his religion in nature. Plaintiff was not bothering a soul. Plaintiff published his motto, *"nature is my sanctuary",* on his social media accounts many years ago and it remains the headline of his Instagram page to this very day. Much like members of the Native American Church, Plaintiff appreciates Allah's design in nature, and often worships there. Just as it is unconstitutional to penalize a Native American for his use of ceremonial peyote, it is also unconstitutional to penalize Plaintiff for his choice to commune with nature on a higher plane.

18.     At all times relevant, Plaintiff simply desired to enjoy his vacation and be left alone in peace. At the time of Plaintiff's confinement, he was managing multiple rental properties in Augusta, Georgia and prosecuting a federal civil suit. Plaintiff had only came to Asheville for a short 3-day vacation. Plaintiff was scheduled to check out of his hotel room on or about 9/21/2016.

19.     At no time did Plaintiff act in such a manner as to evidence that, *if left alone in nature or in the care of his family and friends who lived nearby,* he would be unable to satisfy his need for nourishment, personal or medical care, shelter, safety and protection.

20.     To deny Plaintiff the benefit of freedom on the basis of his religious expression is to penalize him for his religious expression. Here, RB, the Unknown deputy's agent, based nothing

more than hearsay and her own bias, specifically singled out Plaintiff's alleged religious comments, cultural beliefs, and personal expressions as the grounds for commencing an IVC.

21.     Plaintiff is informed and believes that each defendant intentionally failed to respect, protect and preserve Plaintiff's constitutional rights. At minimum, Defendants were deliberately indifferent to the likely consequence that Plaintiff would be unlawfully deprived of his rights and interests based on their repeated deviations from protocol and past occurrences of similar constitutional and statutory violations of law. Defendants denied Plaintiff his right to engage in religious expression, including, but not limited to, religious discussion—an activity that Plaintiff and his friends have peacefully engaged in for many years in and around Asheville.

The First Amendment, incorporated and made applicable to the states by the Fourteenth Amendment to the United States Constitution, prohibits censorship of private religious expression. Plaintiff desired to engage in the expressive activities described herein on the basis of his sincerely held religious beliefs. Defendants' IVC policies and practices chilled, deterred, and restricted Plaintiff from freely expressing his religious views as it subjected him under a broad interpretation of "normalcy" opined according to the religious views and cultural bias of Defendants' employees.

RB's choice to file an IVC petition against Plaintiff in furtherance of the State's IVC policy substantially burdened Plaintiff's free exercise of religion by conditioning his right to speak and associate according to his sincerely held beliefs and culture. Despite that there were no reasonable grounds for commencing an IVC against Plaintiff, RB willfully and wantonly deviated from the accepted medical standards of her profession in submitting a false affidavit for the Unknown deputy to deprive Plaintiff of his liberty. RB knew that Plaintiff would be deprived of his liberty as a result of her intentionally false petition. RB demonstrated a complete disregard for the consequences of her actions and expressed no remorse for the harm she caused Plaintiff to endure.

Defendants' policy and practice prohibited Plaintiff from engaging in expression based on the religious content and viewpoint of the expression he desired to engage. Plaintiff's religious expression did not materially and substantially interfere with the order, general welfare, safety, and protection of the public. Plaintiff's religious expression did not materially and substantially interfere with the order, general welfare, safety, and protection of self. At no times did Plaintiff's alleged "strange" behavior rise to a level of dangerousness to himself or the County's citizens.

Defendants' IVC policy and practice of granting unbridled discretion to private physicians to censor Plaintiff's religious expression while permitting Christians, Jews, Nudists, Satanists, Politicians, and Atheists to engage in unbridled expressions of their faith—also constitutes viewpoint discrimination, which is unconstitutional in any type of forum. This unequal treatment of Plaintiff based on the religious nature of his expression and unique expression of individuality is a content-based restriction in an otherwise open society for individualized expression.

22.     Defendants' policies and practices unreasonably interfered with Plaintiff's pursuit of happyness and resulted in the denial of Plaintiff's ability to freely practice his religion.

23.     As a direct and proximate consequence of Defendants' wrongful acts in violation of the 1st Amendment to the U.S. Constitution and N.C. Constitution Article I, § 13, Plaintiff suffered and continues to suffer actual and potential injury to his health and reputation and is entitled to compensatory damages for all injuries caused by their wrongful acts.

### 4TH AMENDMENT VIOLATION. – See Sections D & E facts of Affidavit.

24.     Plaintiff's right to be free of unreasonable searches and seizures is a clearly established right. At all times relevant hereto, Plaintiff was exercising his right to sunbathe in the forested area of Biltmore's private property. Plaintiff was not dangerous to anybody in any way. The Court's task is to assess whether the facts alleged, taken in the light most favorable to Plaintiff, indicate that the Unknown deputy had probable cause to seize Plaintiff for a psychiatric evaluation.

"Probable cause is a practical, nontechnical conception that addresses the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act… [P]olice officers must have probable cause to believe that the individual posed a danger to [him]self or others before involuntarily detaining the individual. If probable cause was lacking, then [Plaintiff] has successfully asserted the violation of a constitutional right — specifically his Fourth Amendment right against unreasonable seizure." Bailey v. Kennedy, 349 F.3d 731, 739 (2003) (internal quotation marks omitted).

"The overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State… [t]he security of one's privacy against

arbitrary intrusion by the police as being at the core of the Fourth Amendment and basic to a free society." Schmerber v. California, 384 U.S. 757, 767 (1966) (internal quotation marks omitted).

> "[T]he Fourth Amendment's prohibition is not limited to cases involving arrests... the right to be free of a seizure made without probable cause does not depend upon the character of the subsequent custody... and although the right may overlap somewhat with the right to due process, governmental conduct amounting to seizure of the person must be scrutinized under the more specific rules deriving from the fourth amendment... [I]n the context of seizure of the mentally ill... such a seizure is directly analogous to a criminal arrest and must therefore be supported by probable cause... Put another way, no reasonable police officer could have thought that taking [Plaintiff] against [his] will for a psychiatric evaluation was more akin to a mere investigative *Terry* stop than to a complete seizure by arrest for a state's custodial purposes... At issue, then, is whether plaintiff's behavior at the time of the arrest was sufficient to justify a finding of probable cause for [his] eventual commitment to the Unit... The gravity of the constitutional harm to a person wrongly seized for mental illness lay behind the court's concern for requiring proper procedural and substantive standards before such a seizure... Commitment to an Evaluation Unit, even for a day, involves a loss of liberty, privacy, free association and could well have the effect of creating a stigma against the person confined; such a deprivation can create a stigma of mental illness which can be as debilitating as that of criminal conviction." Gooden v. Howard County Maryland, 917 F.2d 1355 (1990) (internal quotation marks and parentheses omitted).

**25.** At the time of the arrest, Plaintiff did not exhibit any indicators of a mental illness or imminent dangerousness to self or others. There was no reason or justification for the Unknown deputy to have Plaintiff taken to the hospital for a criminal investigation or psychiatric evaluation.

**26.** At the time of the arrest, the Unknown deputy knew that Plaintiff was not in need of immediate hospitalization. The Unknown deputy knew, or should have known, that Plaintiff was capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends who lived nearby. The Unknown deputy knew, or should have known, that Plaintiff was not in any genuine danger to himself or others. The Unknown deputy knew, or should have known, that he was required to write and file a report after arresting and transporting Plaintiff.

**27.** No reasonable person would have deduced from Plaintiff's nudity, silence, and affirmative sign language that he was suffering from a mental illness. No reasonable person would have deduced from Plaintiff's *lack* of weapons/bruises/cuts that he was imminently dangerous to himself and others. No reasonable person would have deduced that Plaintiff's cooperation with the

Unknown deputy's arrest was a sign of public intoxication or indicative of a guilty mind following a commitment of a crime. No reasonable person would have deduced that Plaintiff's meditation in the woods was anything more than the normal freedom-loving behavior of an Asheville hipster.

**28.**     Upon information and belief, the first responders intentionally failed to write an incident report about Plaintiff's arrest and transportation to MHI so as to cover up their violations and foster ambiguity surrounding the Unknown deputy's decision to arrest Plaintiff under color of law.

**29.**     Upon information and belief, the Unknown deputy abused his authority in seizing Plaintiff's body and having him transported to MHI without a warrant and without probable cause, in violation of the 4th Amendment to the U.S. Constitution and N.C. Constitution Article I, § 19.

**30.**     Upon information and belief, the Unknown deputy abused his authority in having HD-1 seize Plaintiff's blood without a search warrant and without probable cause, in violation of the 4th Amendment and state constitution. Upon information and belief, because there was no legitimate reason or probable cause to arrest and imprison Plaintiff, and because MHI exercised unlawful control over Plaintiff for the Unknown deputy prior to the issuance of a custody order, BC is liable for the false arrest and resulting false imprisonment of Plaintiff. Plaintiff was held against his will and over the objections of his family for a period of 16 days in violation of state and federal law.

**31.**     As a direct and proximate consequence of the acts of BC/MHI's agents and employees in violation of the 4th Amendment to the U.S. Constitution and N.C. Constitution Article I, § 19, Plaintiff suffered and continues to suffer actual and potential injury to his health and reputation and is entitled to compensatory damages for all injuries caused by Defendants' wrongful acts.

### *14TH AMENDMENT VIOLATION OF DUE PROCESS. – See Section G facts of Affidavit.*

**32.**     Pursuant to N.C. Gen. Stat. § 122C-268(a) and (d), Plaintiff's right to a district court hearing within 10 days of the day he was taken into custody, his right to choose his own counsel to represent him in the matter, and his right to be free from an unconstitutional confinement, are all clearly established rights. *See* O'Connor v. Donaldson 422 U.S. 563 (1975).

**33.**     Under state law, MHI owed Plaintiff the following duties, *without limitation:* (1) MHI's first commitment examiner, RB, was required to send a copy of her findings to the clerk of the

superior court by the most reliable and expeditious means (N.C. Gen. Stat. § 122C-263(e)); (2) MHI's attending physician, HD-6, was also required to send a copy of her findings to the clerk of the superior court by the most reliable and expeditious means (N.C. Gen. Stat. § 122C-266(c)); and (3) after no hearing or continuance occurred by the 10th day, HD-6 was required to discharge Plaintiff from MHI and notify the clerk of court by the most reliable and expeditious means (N.C. Gen. Stat. § 122C-266(d)). MHI's employees purposely neglected to carry out those required duties. In failing to perform, RB and HD-6 breached their duties owed to Plaintiff which caused Plaintiff to be held at MHI for 16 days without a district court hearing, in violation of due process.

34.     Under state law, BC owed Plaintiff the following duties, *without limitation*: (1) The clerk or magistrate was required to make inquiry as to whether Plaintiff was indigent (N.C. Gen. Stat. § 122C-261(c)); (2) the Clerk of the Superior Court was required to calendar the matter for a hearing in the district court within 10 days of the date Plaintiff was taken into custody (N.C. Gen. Stat. § 122C-264(b)); (3) the clerk was required to notify Plaintiff of the time and place of the hearing (N.C. Gen. Stat. § 122C-264(b)); and (4) after no continuance or hearing occurred by the 10th day, the clerk was required to terminate the proceedings (N.C. Gen. Stat. § 122C-266(d)). The clerk and magistrate purposely neglected to carry out those duties. In failing to perform those tasks, BC breached its duties owed to Plaintiff which caused him to be held for 16 days without being served with notice of a hearing, without a district court hearing, and without his choice of counsel.

35.     "To identify the specific dictates of due process under the Due Process Clause, a court must weigh three factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. In the context of involuntary confinement of the mentally ill, due process requires that, even if the "original confinement was founded upon a constitutionally adequate basis ... [confinement cannot] constitutionally continue after that basis no longer exist[s]... Beginning with the first Mathews factor, the Court finds that an individual's interest in avoiding indefinite civil confinement...is substantial. An individual who is unilaterally certified and indefinitely detained...is substantially deprived of his physical liberty... As to the second Mathews factor, the Court finds that an erroneous deprivation of liberty under the Act is

likely, if not inevitable. For there to be no likelihood of error in certifying detainees, the Government would have to contend that its certification process was error proof, an impossibility, and, if it were error proof, there would be no purpose in judicial review." United States v. Timms, 799 F. Supp. 2d 582, 593-94 (E.D.N.C. 2011) (internal quotations and citations omitted).

36.     Here, Defendant RB, acting as the County's agent, filed a false affidavit certifying that Plaintiff fit the criteria for an involuntary commitment (***immediate hospitalization not necessary***). As a result of her petition (which was devoid of any evidence), Plaintiff was confined for 16 days in MHI's Copestone ward, in violation of the 14th Amendment to the U.S. Constitution. No lawful continuance, subsequent custody order, or commitment order was ever issued by the Court.

37.     As a direct and proximate consequence of the acts of BC/MHI's agents and employees in violation of the 14th Amendment to the U.S. Constitution and N.C. Constitution Articles §§ 21 and 36, Plaintiff suffered and continues to suffer actual and potential injury to his health and reputation and is entitled to compensatory damages for all injuries to his person caused thereby.

### COUNT II. ASSAULT & BATTERY – *See Section F facts of Affidavit*
*This count is against all defendants except Defendant Surety*

38.     At all relevant times, Plaintiff did not consent to any physical contact with Defendants; and Plaintiff was justifiably apprehensive that Defendants' contact may cause him physical harm.

39.     Without justifiable reason or medical procedure for doing so, HD-3 and HD-4 deliberately, and for the purpose of intentionally inflicting emotional distress upon Plaintiff, pinned his body to the ground and forcefully administered a heavy sedative into Plaintiff's veins while Plaintiff was in *time-out* – already isolated from others. Plaintiff stated three times aloud: "I do not consent". Shortly after, MHI's heavy sedative took effect and Plaintiff loss consciousness. MHI's employees did not have any reasonable grounds or justification to forcefully medicate Plaintiff like that.

40.     After Plaintiff was confined in Defendants' custody exceeding 10 days, JD deliberately punched Plaintiff in the face. As a result of JD's attack on Plaintiff, Plaintiff's eye bled profusely. Plaintiff did not solicit, provoke, or desire such physical attacks from JD.

41.     Each defendant's unwanted contact caused Plaintiff to suffer physical and emotional harm. Defendants' conduct constituted separate and distinct counts of assault and battery on Plaintiff.

Upon information and belief, the defendants acted together in a concerted effort to cause Plaintiff harm. As a result of the assaults and batteries, Plaintiff suffered permanent damages.

## COUNT III. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### *See Sections E, F, G facts of Affidavit*
*This count is against all defendants except Defendant Surety*

**42.**     The acts and omissions of BC and MHI and its agents and employees alleged in this complaint are extremely negligent and outrageous. The acts and omissions of Defendants were intended to and did in fact cause Plaintiff to suffer intensive and continuing pain, loss of consciousness and severe emotional distress. The acts and omissions of each defendant were unnecessary, without excuse, were above and beyond all possible bounds of decency, and should be regarded as intentional, atrocious and utterly intolerable in a civilized community.

**43.**     Plaintiff is entitled to damages, actual and punitive, against Defendants, jointly and severally, in an amount in excess of $75,000.

## COUNT IV. GROSS NEGLIGENCE – *See Section A through H facts of Affidavit*
*This count is against all defendants except Defendant Surety*

**44.**     Plaintiff incorporates by reference all of the above as if fully restated in this paragraph.

**45.**     "An act or conduct rises to the level of gross negligence when the act is done purposely and with knowledge that such act is a breach of duty to others" Boryla-Lett v. Psychiatric Solutions of N.C., Inc., 685 S.E.2d 14, 19 (N.C. Ct. App. 2009). At all times relevant hereto, Defendants knew, or should have known, that they each owed Plaintiff a duty to adhere to the required protocols for a non-emergency IVC. In breach of their duties and Plaintiff's rights, each defendant intentionally disregarded the required protocols and caused Plaintiff harm. A county can be sued directly under § 1983 pursuant to a governmental custom even if "such a custom has not received formal approval through the body's official decisionmaking channels." Carpenter v. Trammel, CIVIL CASE NO. 1:18-cv-00016-MR-WCM (W.D.N.C. May. 13, 2019).

**46.**     Upon information and belief, Plaintiff's injuries were caused by the Sheriff's, BC's, and MHI's policies, patterns, and customs of inadequately training their employees on the required protocols of an emergency and non-emergency IVC. As Plaintiff will show with the evidence

introduced through the framework of this complaint, insha'Allah, there are several prior instances wherein BC's and MHI's employees failed to adhere to the required IVC protocols of the state.

For example, on numerous occasions: (1) the Sheriff's deputies failed to write a report showing probable cause existed to arrest a person and take him to MHI for a psychiatric evaluation; (2) the Sheriff's deputies failed to make the disclosures required by N.C. Gen. Stat. § 122C-251(c); (3) MHI's employees failed to comply with accepted medical standards and state law in their involuntary treatments and examinations; (4) MHI's commitment examiners failed to provide specific information to their patients as required by N.C. Gen. Stat. § 122C-263(g); and (5) although BC and MHI knew of these repeated deviations from required protocols, BC/MHI repeatedly refused to take corrective actions to prevent the foreseeable risk of harm posed thereby.

BC/MHI's decision to perpetuate its custom of inadequate mental health employee training is the primary factor, or moving force, that caused the violations of Plaintiff's constitutional rights.

47.     Prior to the State's issuance of a 7-day temporary custody order, HD-1 had a legal duty to obtain Plaintiff's consent or a search warrant to draw his blood. HD-1 had a duty to inform Plaintiff of sufficient facts to enable him to intelligently consent to any pre-custody order treatments. HD-1 failed to obtain Plaintiff's consent to treatment, or in the alternative knew, or should have known, that Plaintiff was not consenting and/or revoked his consent for treatment, including without limitation, treatment for an alleged mental illness.

48.     At all times, HD-1 knew, or should have known, that she owed Plaintiff a duty to adhere to the required protocols for obtaining consent in a non-emergency situation. Despite knowing her duty, HD-1 intentionally disregarded her duty owed to Plaintiff and took his blood, over his verbal objections. Plaintiff specifically told HD-1 that he did not consent to any blood draw prior to HD-1 drawing his blood. HD-1's failure to obtain consent or a warrant displays her willingness to disregard Plaintiff's right to not have his life-blood taken in a non-emergency situation.

49.     On 9/20/2016, sometime in between the moment Plaintiff was arrested and RB's alleged first examination, HD-2 secretly tranquilized Plaintiff without his consent. MHI's heavy sedative administered into Plaintiff's bloodstream disoriented Plaintiff and caused him to lose consciousness. HD-2 failed to obtain Plaintiff's consent, or in the alternative knew, or should have

known, that Plaintiff was not consenting and/or revoked his consent for sedation, including without limitation, sedation for failing to cooperate with labs or eat hospital food. HD-2 knew, or should have known, that Plaintiff would not agree to such forced injections. HD-2's willful sedation of Plaintiff without reason or justification fails to comport with accepted medical standards.

50.     At all times, HD-2 knew, or should have known, that he owed Plaintiff a duty to adhere to the required protocols for forcefully medicating Plaintiff in a non-emergency situation. Despite knowing his duty, HD-2 intentionally disregarded his duty owed to Plaintiff and sedated him without his consent or knowledge. HD-2 wantonly sedated Plaintiff because of his religious expressions and for no other reason. HD-2 failed to comport with professional standards.

51.     After that, RB entered Plaintiff's room without his consent and allegedly conducted a first examination while Plaintiff was still in bed. This occurred on 9/20/16 at or about 11:01 PM.

52.     At all times relevant, there was no emergency that existed which could have excused Defendants' lack of consent. HD-1 and HD-2 did not disclose to Plaintiff the risks of such treatments and did not respect Plaintiff's aversion to needles or Eurocentric chemicals entering his body. MHI wantonly disregarded the material risk that any involuntary treatment, *without appropriate justification*, may violate Plaintiff's religious beliefs. The Moorish American's position of not submitting to European medical treatments or consuming poisonous foods is publicly known. "[T]he materiality test promotes the paramount purpose of the informed consent doctrine — to vindicate the patient's right to determine what shall be done with his own body and when… A material risk is one which a physician knows or ought to know would be significant to a reasonable person in the patient's position in deciding whether or not to submit to a particular medical treatment or procedure." Lipscomb v. Memorial Hosp, 733 F.2d 332, 336 (4th Cir. 1984)

53.     As a result of Defendants' willful misconduct, Plaintiff suffered emotional distress. Their wrongful acts were reckless and malicious which entitles Plaintiff to punitive damages.

54.     At all times relevant hereto, RB's supervisor, HD-7, knew, or had reason to know that RB was an incompetent employee. HD-7 knew, or should have known, that because of RB's history of providing inadequate medical treatment and failing to follow procedures, RB was likely to cause injury to Plaintiff or others. HD-7 knew that RB was unfit to conduct commitment examinations

for the State of North Carolina. "North Carolina recognizes a cause of action for negligent supervision and retention as an independent tort based on the employer's liability to third parties." Smith v. Privette, 128 N.C. App. 490, 494 (N.C. Ct. App. 1998).

55.     Prior to RB's tortious act of allegedly examining Plaintiff for commitment without a custody order and while he was sedated in bed, HD-7, knew or had to reason to know that RB was an incompetent commitment examiner, given the fact that she was unable to follow the required steps of the IVC process. HD-7 intentionally disregarded RB's recklessness in basing her opinion IVC opinion on unsubstantiated conclusions and hearsay. HD-7 knew of RB's incompetence, but failed to properly train and supervise RB to work as a commitment examiner. HD-7 displayed a complete lack of care in correcting RB's inadequacies. HD-7 knew, or should have known, that RB had used such inadequate methods for commitment in the past. Despite knowing that RB posed a risk of depriving patients of their constitutional rights, HD-7 continued to allow RB to continue to act as a commitment examiner. Due to HD-7's inaction, RB was allowed to ***copy/paste*** her false conclusions into the first examination form which misled the magistrate in issuing a custody order.

56.     At all times relevant, there was a special relationship between MHI and JD. JD was HD-8's patient and HD-8 had knowledge concerning JD's violent propensities and history of assault. HD-8 and other members of MHI's staff had the ability and opportunity to control JD at the time of his criminal acts against Plaintiff, but instead of doing so, they sat back and watched JD attack Plaintiff. A finding that a special relationship exists and imposes a duty to control is justified where "(1) the defendant knows or should know of the third person's violent propensities *and* (2) the defendant has the ability and opportunity to control the third person at the time of the third person's criminal acts." McArdle v. Mission Hosp., Inc., 804 S.E.2d 214, 218 (N.C. Ct. App. 2017).

57.     While watching the events that led up to JD punching Plaintiff in the eye, HD-3 knew that Plaintiff was at risk of harm but breached its duty in failing to protect Plaintiff from that foreseeable harm. Further, after Plaintiff was seriously injured by that punch and in need of medical attention, MHI's employees were deliberately indifferent to Plaintiff's medical needs and they denied Plaintiff meaningful medical treatment for his injuries. "In order to establish a claim of deliberate indifference to a medical need, the need must be both apparent and serious, and the denial must be

both deliberate and without legitimate penological objective." <u>Brown v. Brunden</u>, NO. 5:12-CT-3215-FL, 3 (E.D.N.C. May. 31, 2013).

**58.** Plaintiff is informed and believes, and on that basis alleges that each employee of BC and MHI who was involved in Plaintiff's involuntary treatment and confinement acted pursuant to and within the scope of the relationships alleged above, that BC and MHI authorized, ratified, adopted, conspired, approved, controlled, encouraged, and/or aided and abetted each employee's willful misconduct. BC and MHI are vicariously liable for all injuries to Plaintiff's reputation and person.

## COUNT V. ACTION ON OFFICIAL BONDS

**59.** N.C. Gen. Stat. § 58-76-5 creates a cause of action based on the neglect, misconduct or misbehavior in office of any sheriff, or sheriff's deputy, in favor of any person injured as a result and provides that such injured person may institute a suit against the sheriff and the surety upon his bond.

**60.** Plaintiff is entitled to damages against the Surety for the amount of said bond for the Sheriff, former Sheriff, and County.

## VI.     **STANDARD OF LIABILITY**

**61.** The Unknown deputy, RB, and Hospital Does 1-10 knew, or should have known that they owed Plaintiff a duty of care conforming to professional standards. Despite knowing this, they each intentionally violated Plaintiff's rights by purposely deviating from required protocols which they knew could and/or would cause Plaintiff harm.

**62.** Defendants breached that duty of care owed to Plaintiff by deliberately performing unnecessary treatments on Plaintiff and intentionally failing to disclose to Plaintiff any and all facts that could have apprised him of the "next steps" of the IVC process. Had Plaintiff been apprised of those facts during the 16-day confinement, Plaintiff would have gained insight sooner.

**63.** It was because of the defendants' misrepresentations and willful refusal to disclose certain facts to Plaintiff that it became necessary for him to conduct extensive research into this matter to discover and gain knowledge of any plausible causes of action against the defendants. Plaintiff believes that the defendants' wrongful acts prevented him from filing this action at a much earlier

date. Plaintiff mistakenly omitted the County's name in the original complaint given the fact that Plaintiff did not know RB and MHI were acting as County's agents until much later. Plaintiff is still trying to discover the identity of John Doe, the patient who punched Plaintiff in his left eye, but those records are still held away from public view by MHI.

64.     As a result of the defendants' alleged breaches of duty, Plaintiff suffered damages, including, but not limited to: physical harm, embarrassment, emotional distress, loss of privacy, stigma of a mental illness, inferred loss of the right to bear arms in N.C., and mental pain and suffering. Defendants' conduct was malicious and/or in reckless disregard of Plaintiff's rights. Plaintiff is entitled to general damages, special damages, punitive damages, and treble damages.

65.     At the time of Plaintiff's arrest, any "facility or any of its officials, staff, or employees, or any physician or other individual who is responsible for the custody, examination, management, supervision, treatment, or release of a client and [who fails to follow] accepted professional judgment, practice, and standards is civilly liable, personally or otherwise, for actions arising from these responsibilities or for actions of the client." N.C. Gen. Stat. § 122C-210.1.

After Plaintiff filed by mail his original pleading, the statute was changed to: Any "facility, person, or entity… an acute care hospital, a general hospital, an area authority, a law enforcement officer… or any of their officials, staff, or employees…who is responsible for the custody, transportation, examination, admission, management, supervision, treatment, or release of a respondent or client and who is… grossly negligent, is civilly or criminally liable, personally or otherwise, for that person's or entity's actions or omissions arising from these responsibilities or for the actions or omissions of a respondent or client. N.C. Gen. Stat. § 122C-210.1.

66.     Upon information and belief, pursuant to N.C. Gen. Stat. § 153A-435, BC waived its governmental immunity by purchasing an insurance policy applicable to the injuries alleged in this complaint; pursuant to N.C. Gen. Stat. § N.C. Gen. Stat. § 162-8, former Sheriff JVD and Sheriff QM both waived their governmental immunity by purchasing an insurance policy applicable to the injuries alleged in this complaint; N.C. Gen. Stat. §§ 122C-210.1 and 58-76-5 authorizes suit against Sheriffs JVD and QM, inclusive of punitive damages against both agent and principal; the County also purchased risk pool insurance; and settled one or more claims in the past that included

the same types of causes of action asserted by Plaintiff in this complaint. Defendants are not immune to Plaintiff's state constitutional claims either. They were grossly negligent and malicious.

**67.** Due to the Unknown deputy's concealment and/or destruction of County records, Plaintiff must rely on his belief that the person who took him into custody and transported him to MHI was an employee of the County. The "Unknown deputy", as used in this complaint, refers to an unidentified deputy duly employed, authorized, poorly trained, and negligently supervised by Defendant JVD during the time of Plaintiff's confinement.

**68.** In sum, former Sheriff JVD's deputy purposely caused Plaintiff to be confined in their custody at MHI for 16 days for being naked and *mostly* non-verbal. The deputy unreasonably believed nudity and silence constituted an emergency. Plaintiff was silent and cautious because he was genuinely afraid that they would cause him serious harm. Plaintiff believes there was no legitimate reason for his confinement to continue after getting dressed. Plaintiff's body was covered with clothing shortly after arriving at MHI; and he communicated verbally once at MHI, too. Based on the information made available to him, it does not appear that any adequate reasons were ever established to commit Plaintiff, let alone confine him for a 16-day mental evaluation. Defendants JVD and QM are agents of Buncombe County and liable for the acts and omissions of their deputies that caused Plaintiff harm.

**69.** "Commitment must be justified on the basis of a legitimate state interest, and the reasons for committing a particular individual must be established in an appropriate proceeding. Equally important, confinement must cease when those reasons no longer exist." O'Connor v. Donaldson, 422 U.S. 563, 580 (1975).

**70.** Plaintiff was not negligent in any way and did *not* cause his own injuries.

## VII.    CONCLUSION

At trial, Plaintiff intends to prove before the enlightened conscience of an American jury that Defendants, under color of law, directly and proximately caused Plaintiff's false imprisonment without probable cause ($250,000.00); bodily injuries from the assaults and batteries ($160,000.00); past and future medical expenses ($75,000.00), and other non-economic damages. Plaintiff is also entitled to the maximum award of punitive damages allowable under the law.

## MOORISH AMERICAN PRAYER

Allah the Father of the Universe, the Father of Love, Truth, Peace, Freedom and Justice. Allah is my protector, my guide, and my salvation by night and by day, through

His Holy Prophet, DREW ALI. "Amen".

**WHEREFORE**, Plaintiff moves the Court for equitable tolling of the statute of limitations and respectfully demands the following relief:

a. Issue summons for Jack Van Duncan, Quentin Miller, Western Surety Company, and permit summons by publication for John Doe;

b. Enter judgment against defendants (excluding Surety), jointly and severally, in an amount in excess of $75,000 for damages, actual and punitive, based on Counts I, II, III, and IV – claims for relief;

c. Enter judgment against Surety, in an amount in excess of $25,000 for damages, based on Count V – claim for relief.

d. Award treble damages where applicable;

e. Award general, special, and punitive damages;

f. Award fees and costs under 42 USC 1988 against defendants; and

g. Grant any other relief the Court deems fair, equitable and just.

I, the undersigned Plaintiff, declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in good faith this ___10___ day of April 2020 A.D.

Plaintiff Bro. T. Hesed-El
c/o TAQI EL AGABEY MANAGEMENT
30 N. Gould Street, Suite R
Sheridan, WY 82801
Ph: (762) 333-2075
teamwork3@gmail.com

***** IMPORTANT NOTE *****

Due to widespread health and economic concerns, Plaintiff seeks to settle this matter as soon as possible through any available ADR method such as mediation or *pro se* settlement assistance. Plaintiff lives out of state. Traveling to North Carolina will cause additional costs.

## JURY DEMAND

I, Bro. T. Hesed-El, the undersigned Plaintiff, hereby demand a trial by a jury of twelve (12) true American Citizens on all triable issues of fact.

4/10/2020

Plaintiff Bro. T. Hesed-El
c/o TAQI EL AGABEY MANAGEMENT
30 N. Gould Street, Suite R
Sheridan, WY 82801
Ph: (762) 333-2075
teamwork3@gmail.com

# EXHIBITS

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA

BRO. T. HESED-EL,            )
                              )
         I,               )     Civil Action No. CV 119-285
v.                              )
                              )
JOHN DOE, et al.,          )
                              )
        Defendants.      )

## AFFIDAVIT IN SUPPORT OF 2ND AMENDED COMPLAINT

Personally appeared before the undersigned attesting officer authorized to administer oaths, Brother T. Hesed-El, and affirms the following facts under penalty of perjury:

### *PROCEDURAL BACKGROUND FACTS – Section A.*

**1.** My name is T. Hesed-El. I am a Moorish-American Moslem governed under the divine Laws of the Holy Koran of Mecca. I AM A CITIZEN OF THE U.S.A. Allah made me. Some of the great fathers through which I came are: Abraham, Boaz by Ruth, Jesse, King David, Solomon, Hezekiah, and Joseph by Mary. I am a descendant of the ancient Moabites who received permission from the Pharaohs of Egypt to settle and inhabit North-West Africa; we were the founders and are the true possessors of the present Moroccan Empire. With our Canaanite, Hittite, and Amorite brethren who sojourned from the land of Canaan seeking new homes.

**2.** At the time of my arrest, my usual place of abode was [3620] Goldfinch Drive, Augusta, Georgia, U.S.A. At the time of my confinement, my close friends living in Asheville, NC were willing and able to assist me, if necessary. At the time of my confinement, one or more my family members living in Charlotte, NC were willing and able to assist me, if necessary. At all times, my family members living in Atlanta, Georgia were willing and able to assist me, if necessary.

**3.** On December 30, 2018, I contacted the Buncombe County Government Public Information Office to obtain facts in preparation for this lawsuit against Mission Hospital. Ms. Kassi Day informed me that I should send my public records request to Steven Cogburn, at 828.259.3400.

**4.** On January 17, 2019, after several weeks of investigation, I finally obtained sufficient facts that reasonable inquiry could reveal a cause of action against the County. The defendants' first wrongful act occurred on 09/20/2016 and their last wrongful act occurred on 10/06/2016.

**5.** The statute of limitations relative to this action began to accrue no earlier than 01/17/2019. From the records released on 01/17/2019, I discovered that former Sheriff Van Duncan's deputy, Deputy Sheriff M. Rankine #B1220, was involved in the matter. However, I don't know if that deputy is the one who arrested me on 09/20/2016. In fact, I'm not 100% certain that it wasn't an imposter deputy who arrested me. Nevertheless, I recall the arresting agents wearing official uniforms. I believe that I was detained by an Asheville police deputy and two Biltmore Estate police deputies, and after they asked me if I was alright, I was taken into custody by a deputy Sheriff of Buncombe County and transported to Mission Hospital. I was not able to obtain any County records to confirm this belief, so I must continue to refer to the arresting deputy who took me into custody and transported me to Mission Hospital as the "Unknown deputy".

### *About my possession of sufficient facts that revealed County liability.*

**6.** While I was confined in Mission Hospital's Copestone ward, a 24-hour facility as defined by G.S. 122C-252, I was not provided with an explanation or the grounds for my confinement; nor served with the petition to commence an involuntary commitment; nor served with any magistrate's custody order; nor served with any notice of a district court hearing. I was also deprived of my choice of counsel to represent me in the matter. Further, Mission Hospital did not provide me with a copy of my medical records upon being discharged from their facility on October 5, 2016.

**7.** All state court records of the IVC proceedings were sealed and not made available to me by Mission Hospital's employees or the court-appointed attorney. Simply put, while in Mission Hospital's custody, I was not provided with any papers showing any facts of my confinement. Under those circumstances, the legal injury, loss, and/or damages caused by Mission Hospital's gross negligence, malpractice, and deprivation of rights was not readily apparent to me.

**8.** I didn't discover the facts of the defendants' violations of law until after the court released the records on January 17, 2019. To this day, Mission Hospital still has not disclosed the contact information for my assailant.

**9.** On 09/6/2018, I contacted Mission Hospital to obtain a copy of my medical records. I received the records on or about 10/02/2018. While reviewing the records, I noticed that a great amount of the entries in the records were false, intentionally dismissive of my culture, and based on the religious and cultural bias of Mission Hospital's staff members and County employees.

**10.** While reviewing the records, I also discovered for the first time a reference to the name: *Robin Bryson*. However, Robin Bryson's IVC petition/affidavit was ***not*** contained in those records. Prior to receiving my medical records, I had no knowledge that Robin Bryson allegedly examined me. I don't recall her ever introducing herself to me or providing me any information. As a result, I contacted Mission Hospital to learn more about Robin Bryson's position at the hospital. Mission Hospital informed me that she was the Licensed Clinical Social Worker who submitted the petition to Buncombe County to commence IVC proceedings against me.

With these newly discovered facts, I contacted a law firm, Merritt, Webb, Wilson & Caruso, PLLC, for legal advice. The attorney at that law firm told me that no attorney would be able to provide a meaningful assessment until I obtained Buncombe County's court records.

Based on that legal advice, I called Buncombe County and deputy clerk Janet Watson advised me that she could not release the IVC court records without a court order. In response, I submitted an Emergency Motion requesting the Court to release to me all court records of the IVC proceedings. On January 17, 2019, the Honorable Ward D. Scott released the records to me.

On or about February 1, 2019 after reviewing those court documents, I mailed a confidential copy to an attorney at Merritt, Webb, Wilson & Caruso, PLLC for review and further legal consultation. The attorney informed me that it would be very expensive to file suit against the hospital. Having insufficient funds to afford their services, I sought legal consultation elsewhere.

After that, I contacted 2 or 3 other North Carolina defense law firms that specialized in IVC proceedings. Eventually, I received a response from an attorney at Kirk, Kirk, Howell, Cutler, & Thomas, L.L.P. That attorney advised me that although no commitment order was issued by the district court in the matter, my temporary confinement was still an involuntary commitment for the purposes of possibly restricting my right to bear of arms. Based on her advice, I started to realize that maybe the County played a larger role in my confinement at Mission Hospital.

*About commencement of my suit.*

**11.** Between January 2019 and September 2019, I consulted with multiple attorneys and religious counsel to ascertain the proper course of action to legally vindicate my rights. On September 17, 2019, I filed by overnight mail, under seal, my original pleadings to vindicate my rights. Despite disclosing the identities of all parties to the Court, the Court informed me that I could not proceed under seal. The Court ordered that I file my complaint for public view.

**12.** Based on the facts derived from that order coupled with the advice of counsel, I unsealed my original pleadings and re-filed it by overnight mail on October 4, 2019. The Court received my unsealed complaint and docketed it under this case number on October 7, 2019. This suit was filed within three years of the date of the defendants' last wrongful act. My complaint was timely filed.

*About my notice to Mission Hospital and the County about my intent to sue.*

**13.** After my confinement at Mission Hospital, I lodged an official complaint with Mission Hospital's customer/patient relations department about being mistreated by Mission Hospital and the false entries found in my medical records. Mission Hospital and Buncombe County were given ample notice of my claims and pending litigation concerning their vicarious liability.

*About Defendants' willful and wanton deviation from required protocols.*

**14.** I intend to introduce evidence through the framework of my complaint that shows that the gross negligence and misconduct of Buncombe County's agents, its Sheriff (the "Sheriff")/Robin Bryson/Mission Hospital/and others, was despicable and carried on as a purposeful disregard of my rights. The defendants acted with malice and recklessly deviated from required state protocols. Had these protocols been followed, my confinement more than likely would have been avoided.

**15.** **The arresting deputy willfully deviated from required protocol.**

    a) Initially, I was detained by two agents of the Biltmore Estate Police and an Asheville police deputy because I was walking naked in the woods of the Biltmore Estate. Those agents did not identify themselves as police officers, but they were wearing uniforms. When the Unknown deputy arrived, he assumed custody and took the lead of the arrest.

        (1) At all times relevant, the Unknown deputy did not attempt to inform me that I was not under arrest and had not committed a crime. The Unknown deputy did not inform me as required by N.C. Gen. Stat. § 122C-251(c). The Unknown deputy did not inform me that I was being transported to undergo a psychiatric evaluation. The

Unknown deputy also did not attempt to identify himself as a deputy Sheriff, but his uniform resembled that of a Sheriff's deputy. The Unknown deputy's use of force was apparent and he directed the actions of the other agents on the scene. The Unknown deputy's apparent seniority/authority over the other agents led me to believe he was an employee of Buncombe County. Based on the Unknown deputy's direction, I was taken and transported to Mission Hospital. Because the arresting agent(s) did not inform me as required by N.C. Gen. Stat. § 122C-251(c), at the time of the arrest, I did not know where they were transporting me until I arrived at Mission Hospital. Without required disclosures, it was not unreasonable to believe at that time that I was being kidnapped by persons posing as officials in uniform.

(2) The lack of disclosure deprived me of the context of the arrest. Without this information, I was ignorant as to where I was being transported and for what purpose. I lacked insight of the situation because the Unknown deputy and other responders purposefully failed to disclose the nature of the arrest and transport.

b) The Biltmore Estate Police, Asheville police deputy, and Unknown deputy purposely neglected to write a report showing the grounds for my arrest and transport. Those agents made no writings showing that psychiatric evaluation was necessary.

(1) Their willful violations subjected me to an arbitrary and unnecessary evaluation at the hands of Mission Hospital's incompetent employees based only on hearsay.

(2) There were no exigent circumstances or genuine dangers present that required the Unknown deputy to seek the immediate medical assistance of Mission Hospital's emergency department.

16. **Mission Hospital's employees willfully deviated from required protocol.**

a) After I arrived at Mission Hospital, but before any custody order was issued by the magistrate, and before an inpatient commitment was recommended by a medical professional, a hospital nurse drew my blood without my consent and without a warrant. Then, another nurse secretly injected a sedative into my body.

(1) It was unreasonable, inappropriate, and not in accordance with accepted medical standards for Mission Hospital's employees to take my blood and sedate me without my consent. I was not violent or imminently dangerous to self or others.

(2) This lack of adherence to protocol caused me to lose consciousness, and while I was sedated, Robin Bryson visited me in my room *late at night* without my consent.

17. **Robin Bryson willfully deviated from required protocol.**

a) Before a custody order was issued, and while I was under Mission Hospital's heavy sedative, Robin Bryson allegedly examined me without my consent. Robin Bryson did not introduce herself nor inform me of the nature of her interview. Instead, while my eyes were closed in bed, Robin Bryson falsified an affidavit. Then, Robin Bryson copied a false affidavit and pasted its content into her first examination form.

(1) Upon information and belief, Robin Bryson was not properly trained to act as a state commitment examiner. Robin Bryson was not authorized to conduct an examination. Robin Bryson was not competent or certified to examine me.

(2) Upon information and belief, Robin Bryson did not submit her findings to the clerk by the most reliable and expeditious means, in violation of N.C. Gen. Stat. § 122C-263(e).

(3) After the alleged first examination was completed, Robin Bryson did **not** provide me with any information whatsoever as required by N.C. Gen. Stat. § 122C-263(g).

(a) Her violations caused me to be further deprived of the facts necessary to understand the nature of the proceedings being used against me. I lacked contextual insight into the situation due to Robin Bryson's failure to disclose.

**18.**     **Buncombe County's magistrate judge willfully deviated from required protocol.**

a)     The magistrate or clerk did not attempt to inquire into my ability to afford a private attorney, but instead, secretly appointed a public defender who was wholly ineffective in protecting my rights. Not only was the court-appointed attorney ineffective, but I never accepted him as my representative. He was forced on me.

**19.**     **Mission Hospital's employees willfully deviated from required protocol.**

a)     Pending a court hearing, Mission Hospital's staff inappropriately and unreasonably tranquilized me a second time in violation of the accepted medical standards of our society. This time, the sedation was not done secretly, but while I was in "time-out".

**20.**     **The clerk of court and district court judge willfully deviated from required protocol.**

a)     The clerk did not calendar a commitment hearing within 10 days of the date I was taken into custody, in violation of N.C. Gen. Stat. § 122C-268(a).

b)     The clerk didn't mail to me a notice of a commitment hearing 72 hours in advance.

c)     Because the clerk failed to calendar the hearing within the required 10 days, and failed to mail a notice of a hearing, the district court judge continued the matter for 8 calendar days on the court's own motion – *(scheduled for the 6th business day – not counting the day the order was entered)*, in violation of N.C. Gen. Stat. § 122C-268(a).

d)     "When the language of a statute is clear and unambiguous, it must be given effect and its clear meaning may not be evaded by… a court under the guise of construction… We note that this is not a situation wherein the application of G.S. 1A-1, Rule 6(a) would extend the [five-day] period." In re Jacobs, 38 N.C. App. 573, 576 (1978).

**21.**     **The Unknown deputy and County attorney willfully deviated from required protocol.**

a)     After the County granted the first continuance, Deputy Sheriff M. Rankine #B1220 failed to serve me with notice of the district court hearing at least 72 hours before the hearing. He did not serve me by personal service or substitute service, As a result, the district court never obtained personal jurisdiction over me. I was **not** notified.

(1) As an act to protect former Sheriff Van Duncan, the court-appointed attorney filed a motion without my consent to continue the matter and the Honorable Ward D. Scott granted a 2nd continuance for 7 more days, in violation of N.C. Gen. Stat. § 122C-268(a).

b)     During my sole interview with the court-appointed attorney, which occurred after the first continuance, he refused to show or give me any papers that were in his possession.

*About my motion for reconsideration under the principle of equitable tolling.*

**22.**    On September 17, 2019, I filed by overnight mail my original pleading for this suit. *See,* Case No. CV 119-271. In doing so, I filed it under seal to protect the privacy of all parties. My intention was to avoid further embarrassment and damage to my reputation and Defendants' reputation. In response, the Court denied my motion to seal and dismissed the action without prejudice with instructions that I must unseal my complaint. I followed those instructions, and within 10 days of the Court's dismissal, I filed my unsealed complaint (Doc. 1) with a motion for reconsideration under the principles of equitable tolling.

**23.**    During my confinement in Mission Hospital's facility, I was induced to believe that Buncombe County was not involved in the IVC proceedings. I was not informed of the steps of the IVC process or any other information that could have revealed the harm caused by Buncombe County/Mission Hospital's violations of law until the court released the records on 10/17/2019.

**24.**    Under Federal law, my cause of action began to accrue once I gained possession of sufficient facts about their violations of law. As stated above, this did not occur until after 01/17/2019. During my confinement, all responsible parties were careful to withhold from me any documentation that could have informed me of the facts of the IVC proceedings. Mission Hospital's staff were equally careful not to provide me with any adequate information as to the reasons for my confinement and the next steps that would occur in the IVC process. Mission Hospital was careful to keep me totally in the dark. Being kept in the dark induced me to formulate wild conspiracy theories to make sense of my tragic experiences while in the defendants' custody.

**25.**    Under those circumstances, I was misled to believe that Mission Hospital was acting on its own. I did not learn until after reading my medical records and the County's records that each interview was part of an IVC proceeding initiated by the County. I was misled by the County's and Mission Hospital's wrongful acts to conceal and/or destroy certain records. I didn't learn that Robin Bryson and the Hospital Does' were the County's agent until after 01/17/2019.

**26.**    "Any peace officer taking into custody and delivering for examination a person…shall execute a written report detailing the circumstances under which such person was taken into custody. The report…shall be made a part of the patient's clinical record." O.C.G.A. § 37-3-41(c).

27.     At the time of my arrest on 09/20/2016, I was not mentally ill, not dangerous to myself, nor dangerous to others. I made non-verbal responses which indicated that I was not mentally ill, not dangerous to self, and not dangerous to others. My manner of speaking and religious expression is understood by reasonable people but was apparently misunderstood by unreasonable people.

28.     At the time of my arrest on 09/20/2016, I did not have any weapons on my person. I did not make any threats to harm myself or others. I was not suffering from any suicidal ideations. At no time did I act in a manner that demonstrated that I would be unable, without care, supervision, and the continued assistance of others not otherwise available, to exercise self-control, judgment, and discretion in the conduct of my daily responsibilities and social relations, or to satisfy my need for nourishment, personal or medical care, shelter, or self-protection and safety.

29.     On 09/20/2016, there was no reasonable probability that I would suffer from a serious physical debilitation within the near future unless treatment was given without my consent. At no time did I behave in a manner that was grossly irrational, or emblematic of individuals who are unable to control their behavior. At no time did I exhibit any evidence that my insight was severely impaired beyond a general ignorance to the situation due to the defendants' lack of disclosures. At no time did any of my actions, silence, gestures, or behavior create a prima facie inference that I was unable to care for myself.

30.     At no time have I attempted suicide or mutilated myself or attempted to mutilate myself. At no time was there any reasonable probability that I would or could seriously mutilate myself.

31.     At no time have I suffered from previous episodes of dangerousness to myself or shown any reasonable probability that my mindset could or would deteriorate to the point of physical debilitation, suicide, or self-mutilation.

32.     At all times relevant hereto, I have not inflicted or attempted to inflict or threatened to inflict serious bodily harm on another, or acted in such a way as to create a substantial risk of serious bodily harm to another, or engaged in extreme destruction of property. There was no reasonable probability that I might become dangerous or destructive. At no time have I committed homicide or behaved in such a manner as to raise any suspicion that I would commit a violent act.

33.     At all times relevant hereto, my capacity did not lessen to the point that I was unable use self-control, judgment, and discretion in the conduct of my affairs and social relations as to make

it necessary or advisable for me to be forced under involuntary treatment, care, supervision, guidance, or control.

**34.** Mission Hospital's staff willfully refused to perform any meaningful research into my culture, religion, worldview, healthy mental health history, lack of criminal history, or even consider my family's perspective. Instead, I was confined because my religious beliefs and unique expression of self was different from that of the County's and Mission Hospital's employees.

### *FACTS ABOUT PLAINTIFF'S HEALTH AND PROFESSION – Section B.*

**35.** Under Georgia law, "natural persons are categorized, according to their rights and status." O.C.G.A. § 1-2-2. I retained all of my inherent rights. I have not waived any of my rights.

**36.** I was born outside the city limits of Augusta, in the State of Georgia, 1985. I have two siblings, George and Melissa. They were born in Al-Andalus. I am a descendant of the ancient Moabites who first inhabited this land. In the Great Law of Peace of the Six Nations Confederation, my ancestors are referred to as the Onkwehonwe, or *original beings.*

From the time I was born in 1985 to *present*, I have not ever been committed by a court order to a mental institution or deemed dangerous to myself or others by a competent medical professional. I have no history of mental illness nor any record of violent or suicidal behavior. I work full time as a civil rights coordinator for a non-profit organization. I am a full-time MBA student at Maharishi International University. I usually pray 5x times a day and practice the transcendental meditation technique.

I am not a substance abuser. Any statement to the contrary is false. I am not suicidal and have no record of suicidal tendencies. I have not attempted to kill myself or threatened to kill myself.

In the relevant past, I have not threatened to harm any living being. I even try to avoid killing insects. In my society, it is common to abstain from and refuse all forced vaccinations or needles, allopathic medicines, GMOs, and artificial foods that may harm the body. I have maintained overall good health and behavior my entire life by abstaining from the destructive ideals and practices of the pale-skin nations of Europe and blacks. Alhamdullilah.

*FACTS ABOUT PLAINTIFF'S SINCERELY HELD RELIGIOUS BELIEFS – Section C.*

**37.**     My late father was a Bishop. My mother is a former senior pastor. Together, my parents founded the Cathedral of the Holy Spirit at Living Word Christian in Augusta, Georgia during the late 1970's. As such, I was raised with an in-depth knowledge of the Judeo-Christian faith.

From around January 2013 to December 2014, I worked in Asheville, NC. During that time, I frequently attended live music events, ate good food, attended consciousness festivals, and enjoyed other camping excursions around the Blue Ridge Mountains. As part of my awakening, my mind began to return to its original state of purity, similar to that of Adam and Eve before they ate of the Tree of Knowledge of Good and Evil. "And they were both naked, the man and my wife, and were not ashamed." Helios Biblios, Genesis 2:25.

During Gratifly, a consciousness-festival that I attended around that time, I was reminded of my ancestors' mindset which existed prior to our exile from the Garden of Eden. At that festival, both men and women roamed around the lush environment of Lake Hartwell in the nude. No one seemed to be ashamed. People of diverse ages and ethnicities were in attendance.

Further, even when that county sheriff's department approached our camping grounds on its boat to observe our 1st Amendment expressions, nudity, and overall racial unity at the festival, they made no arrests and bothered no one. They simply showed their presence, then turned their boat around and returned to the place from whence they came. That experience served as a perpetual reminder that there really is no problem with being naked among mixed cultures.

During Gratifly, I camped out in front of the river next to a neighboring couple who had a young baby with them. On some days, I bathed nude in the river, got dressed, and ate breakfast freshly cooked over the fire with my neighbors. Everyone was comfortable in this setting, and no one seemed to feel that anything was wrong with such expressions in the middle of the woods.

It is not uncommon in Asheville for people to express their individuality through nudity. In fact, I attended numerous nude gatherings around Asheville. It is equally common in Asheville for someone to choose to meditate in the woods. I believe that only the lying words of a serpent could cause shame to the point of accusing a man of acting "strange" because of my nudity:

Now the serpent was more subtil than any beast of the field which the Lord God
had made. And he said unto the woman, Yea, hath God said, Ye shall not eat of

every tree of the garden? And the woman said unto the serpent, We may eat of the fruit of the trees of the garden: But of the fruit of the tree which is in the midst of the garden, God hath said, Ye shall not eat of it, neither shall ye touch it, lest ye die. And the serpent said unto the woman, Ye shall not surely die: For God doth know that in the day ye eat thereof, then your eyes shall be opened, and ye shall be as gods, knowing good and evil. And when the woman saw that the tree was good for food, and that it was pleasant to the eyes, and a tree to be desired to make one wise, she took of the fruit thereof, and did eat, and gave also unto her husband with her; and he did eat. And the eyes of them both were opened, and they knew that they were naked; and they sewed fig leaves together, and made themselves aprons. And they heard the voice of the Lord God walking in the garden in the cool of the day: and Adam and my wife hid themselves from the presence of the Lord God amongst the trees of the garden. And the Lord God called unto Adam, and said unto him, Where art thou? And he said, I heard thy voice in the garden, and I was afraid, because I was naked; and I hid myself. And He said, Who told thee that thou wast naked? Hast thou eaten of the tree, whereof I commanded thee that thou shouldest not eat? And the man said, The woman whom thou gavest to be with me, she gave me of the tree, and I did eat. And the Lord God said unto the woman, What is this that thou hast done? And the woman said, The serpent beguiled me, and I did eat. Helios Biblios, Genesis 3:1-13.

In 2015, I reverted back to the old-time religion of my ancestors, Islamism. It is common for Citizens of our Moorish-American Society to frequently discuss the religion of Islam, study the old law, and enforce laws in accordance with the United Nations Declaration on the Rights of Indigenous Peoples. "All Members must preserve these Holy and Divine laws…" Divine Constitution of the Moorish Science Temple of America, Article IV, cl. 1.

"With us all members must proclaim their nationality, and we are teaching our people their nationality and Divine Creed that they may know that they are a part and a partial of this said government, and know that they are not Negroes, Colored Folks, Black People, or Ethiopians, because these names were given to slaves by slave holders in 1779 and lasted until 1865 during the time of slavery… The Moorish Americans are the descendants of the ancient Moabites who inhabited the North Western and South Western shores of Africa." Id., Article VI.

I sincerely believe in the faith instilled in me by the Great-God Allah through His messenger. I do not view other people as being inferior to me. I love all mankind as myself because "[n]o man lives unto himself, for every living thing is bound by cords to every other living thing." Holy Koran of the Moorish Science Temple of America, p. 7, ¶ 2.

The Holy Prophet said, "Every word that I speak is spirit, and you Moors had better heed. *(That is give it attention, obey)*." <u>Oral Statements of the Prophet</u>, p. 2, ¶7. The Holy Prophet said, "This food here, is just European poison." <u>*Id.*</u>, p. 32, ¶ 178. Jesus also said, "Teach them that Allah and man are one..." <u>Holy Koran of the Moorish Science Temple of America</u>, p. 6, ¶ 18. "I and the Father are one." <u>Helios Biblios</u>, John 10:30. "Verily, verily, I say unto you, he that believeth on me, the works that I do shall he do also; and greater *works* than these shall he do; because I go unto my Father." <u>*Id.*</u>, John 14:12.

As a Moorish-American Moslem, I am aboriginal to the Americas. My beliefs, customs, actions, and religious culture are not to be compared with that of the pale-skin nations of Europe, black persons, because I am not of the European caste system nor am I a black person. I am an upstanding member of my community, ordained minister, and former college teacher. I reserve all of my rights of the Asiatic Nation of the States of North America.

### FACTS ABOUT PLAINTIFF'S NUDE SUNBATHING – Section D.

38.     On 9/18/2016, I drove to Asheville for a short vacation. When I arrived, I checked into my room at the Grand Bohemian Hotel: Manor House. On 9/20/2016, I visited the Biltmore Estate. I parked my car in their parking lot and walked onto their private grounds. Once I was past the gates, I became captivated by the beauty of the land. I walked along the streams on the property in a state of gratitude for Allah's many blessings. I was thoroughly enjoying the solitude and the deep sense of peace present in that moment. After a while, I lay on the ground by a flowing stream to take a nap in the Sun.

When I awoke, it was still daylight outside. No other people were in sight. I looked around again just to make sure I was alone in that area. Feeling completely unencumbered at that time, I decided to enjoy an afternoon stroll in the woods. I stood up, took off my clothes, and placed them neatly folded by the stream. I also placed my car key under a large rock near the stream to ensure it would be there when I returned. I then walked away from the stream, and into the heavily wooded private forest area of the estate, even further away from the general public. At that time, I was in a complete state of meditation in the timeless presence of the Most High. I had no cuts, bruises, or weapons on my person. I was not making any loud sounds or disturbing the peace. I was not committing any violent acts. I was **not** dangerous to myself or others. I was simply enjoying an afternoon stroll in the woods. The fact that I was nude posed no threat of harm to anyone.

**39.** While in the private wooded area, I was approached by two Biltmore police employees and an Asheville police deputy. In response to their sudden appearance and perceived hostility, I immediately laid still on the ground, on my back, with my arms and legs spread in the open position to lower my chances of being shot by the police. (*People streak public events all the time and aren't committed to a mental institution for it, but for some reason, the guards and the Asheville police seemed to be uncomfortable seeing my nakedness.*) The Asheville deputy quickly brought a white sheet and placed it over my private parts. While under the deputy's detention, one of them asked me: *Are you alright?* **I responded using sign language**, and with a right handed "thumbs up", I told them I was "alright". The Asheville deputy acknowledged my response.

**40.** The deputies were reasoning among themselves trying to figure out why I wouldn't speak. The Asheville deputy police verbally reminded the Biltmore police that I had responded with a non-verbal "thumbs-up" which indicated that I was free of injury or mental impairment. The Biltmore police indicated to the Asheville deputy that they were aware of my non-verbal responses.

**41.** A few moments later, an unknown deputy arrived on the scene and assumed custody of me. The unknown deputy asked the others: *Ya'll really want me to take him to jail?* The unknown deputy did not offer to me an opportunity to get dressed or voluntarily leave. The unknown deputy knew that if he arrested me for a crime, he would have to write a report. To avoid his duty, he had me taken to Mission Hospital instead. In bad faith, the unknown deputy confined me at the hospital.

**42.** Despite that there was no legitimate reason for the unknown deputy to continue my confinement at Mission Hospital, the Unknown deputy willfully and wantonly deviated from accepted law enforcement standards in delegating his duty to report to the hospital's employees. The unknown deputy knew that I would be deprived of my liberty as a result of his avoidance of standard procedures. The Unknown deputy did not inform me that I was not under arrest and had not committed a crime. The Unknown deputy did not inform me that he had transported me to receive treatment for my safety and that of others. The Unknown deputy demonstrated a complete disregard for my rights, expressed no remorse for my resulting injuries, and purposely minimized my quality of life by subjecting me to the most restrictive means of curtailing my freedoms.

**43.** Prior to taking me into custody, the Unknown deputy willfully failed to inform me that I was not under arrest and had not committed a crime. Once in the hospital, an unknown nurse drew

my blood for the Unknown deputy without my consent and without a search warrant.[1] Shortly after, I walked to a nearby Mission Hospital computer, logged into my Facebook account, and posted on my timeline: *Choose ye this day who ye shall serve.*

### FACTS ABOUT Robin Bryson'S FALSE IVC PETITION – Section E.

**44.** That night while I was asleep, Robin Bryson, by direction of the Unknown deputy, swore out a petition to commence the procedure to have me involuntarily committed to a mental institution. The statements expressed in Robin Bryson's IVC affidavit were demonstrably false. Robin Bryson based her false affidavit on Christian beliefs and bias. Robin Bryson had no prior knowledge of me, my habits, history, culture, values, friends, or family. I did not receive a copy of her false affidavit until Jan 17, 2019.

**45.** Robin Bryson filled out an IVC form petition and placed a "X" in certain boxes to indicate that I was mentally ill and dangerous to myself and others, as defined by N.C. Gen. Stat. § 122C-3(11). "Merely placing an "X" in the boxes… does not comply with the statute" In re J.C.D., No. COA18-957, 12 (N.C. Ct. App. May. 21, 2019). In bad faith, she basically used a boilerplate which quoted the IVC statutes. She knew that she was required to cite facts, but she cited conclusions.

**46.** The conclusions upon which her recommendation was based were stated in her petition as follows: "Patient's thought content displays delusional thinking – (1) *"we are all family in this universe. I am the god and you are my people young sister"*; (2) *"…laughing inappropriately"*; and (3) *"hypervigilant"* (e.g. mental alertness). When I read Robin Bryson's petition, it seemed to contain nothing more than conclusory allegations and confirmation bias based on the stigma created by the Unknown deputy's decision to have me transported to the hospital for an evaluation.

**47.** Robin Bryson inserted an "X" in certain boxes to indicate that I was mentally ill, dangerous to self, and dangerous to others. However, her petition contained no facts or evidence that I was mentally ill or dangerous to self and others. Robin Bryson's conclusory allegation that my mental status was "altered" was not based on any prior knowledge of my alleged "unaltered" mental state. Robin Bryson falsely concluded that I couldn't contract for my safety by myself or with my family.

---

[1] The Unknown deputy's comments about taking me to jail implies that the Unknown deputy was called to the scene to arrest me for trespassing and/or indecent exposure. I remained in the Unknown deputy's custody from the moment of arrest on 9/20/2016 until custody was transferred to Mission Hospital on 9/26/2016 at 5:38 PM. I purchased a season pass to the Biltmore Estate which granted me full access to roam around their private grounds.

**48.** Robin Bryson knew that my behavior did not fit the criteria for an involuntary commitment. Robin Bryson knew that if she filed the IVC petition with the County, I would be deprived of my rights and subjected to unnecessary medical and psychological treatments. Upon information and belief, Robin Bryson was reckless in concluding that my alleged religious expressions, laughter, mental alertness due to regular meditation, and nudity were grounds for an IVC under color of law.

**49.** Robin Bryson's IVC petition/affidavit against me was made in bad faith. At all times, Robin Bryson knew she owed me a duty to comply with accepted medical standards and required protocols. But instead of doing so, Robin Bryson intentionally disregarded her duties and sought the most restrictive method of chilling my religious expression. Robin Bryson's actions were done on behalf of the Unknown deputy, but there was no legitimate governmental interest to be achieved by doing so. Robin Bryson and her co-conspirators were motivated by money. The state's policy, in fact, is to "favor a less restrictive mode of treatment than involuntary commitment whenever appropriate." Currie v. United States, Civ. No. C-85-0629-D, 1081 (M.D.N.C. 1986). Robin Bryson abused her medical authority in making an unreasonable inquiry into my religious beliefs and then using my alleged religious responses as the basis for an involuntary commitment.

**50.** The next day, after Robin Bryson submitted her IVC petition *(I didn't see her petition until Jan 17, 2019)*, I was moved to Mission Hospital's holding area for patients who have not yet been admitted into a 24-hour facility. At that time, no bed was available in Mission Hospital's Copestone program.

### *FACTS ABOUT MISSION HOSPITAL'S PREMISES NEGLIGENCE – Section F.*

**51.** Seven days later, I was admitted into Mission Hospital's Copestone ward for violent IVC patients. But I had not exhibited any violent behaviors to warrant my placement in that ward.

**52.** The Copestone ward was a very unsafe environment where violent patients, substance abusers, and mentally ill persons were held against their will. One patient said that his dad committed him to Mission Hospital's mental ward because he kept starting fires. I felt that I needed to be on guard at all times to prevent being attacked by one or more of Mission Hospital's patients.

**53.** On or about the 10th day of confinement, I was unreasonably placed in "time-out". *("Time-out" is like "the hole" as used in state and federal penitentiaries. The room was locked from the outside and I was not allowed to freely roam the Copestone ward's hallways during time-out.)*

While in time-out, I was free-style rapping out loud and it apparently got on the hospital employee's nerves. The hospital employee threatened that I must be quiet, and if I refused, I would be tranquilized. I continued to rap out loud as an act of free will. I didn't feel he had the right or authority to make me be quiet.

**54.**     In response to my act of defiance in continuing to rhyme out loud, two hospital employees rushed into my time-out cell with two unknown deputies. To prevent any possibility of being shot or beaten, I laid down on my floor mat, on my back, with my hands and feet visible. Two of those employees pinned my body to the ground while a hospital employee began to administer a heavy sedative into my bloodstream. I calmly informed them: *I do not consent. I do not consent. I do not consent.* I made sure to make direct eye contact with the female deputy and other employees while saying that. I remember she looked shocked by what was happening in that moment.

**55.**     After they exited my solitary confinement cell, I got up and returned to free-styling at my cell window. But not long after, the tranquilizer began to kick-in. As a result, I could no longer stand up. I quickly lost consciousness. The next morning, I was released from the hole and allowed to return to the patients' common area. There, I saw John Doe, one of Mission Hospital's patients. I recall seeing John Doe on or around the first day I arrived in the Copestone ward.

**56.**     Upon information and belief, at this point, I had been in custody exceeding 10 days.

**57.**     While I was sitting in the patients' common area calmly having a conversation with a couple of patients, John Doe stood up and violently punched me in my eye for no good reason. I noticed that my eye was bleeding and my vision became blurry. However, I did ***not*** hit him back.

**58.**     After watching me get attacked by that patient, the same hospital employee who sedated me rushed over to me, and said: *I saw the whole thing – and you didn't do nothing.* However, he didn't try to prevent the attack or provide adequate medical treatment for my injuries after the attack. Instead, he asked me if I wanted to press charges against the patient who punched me.

**59.**     At all times relevant, Mission Hospital had knowledge of John Doe's violent propensities. John Doe was purposely held in the violent ward of Mission Hospital's Copestone program. Mission Hospital and its employees had the legal right, ability, and opportunity to control John Doe at the time of the attack, but failed to protect me from that foreseeable harm.

**60.** Shortly after the attack, an unknown deputy approached me and informed me that I could file charges against JD once I was released from the Copestone ward. However, Mission Hospital never revealed JD's contact information to me so that I could press charges against him.

**61.** Right after that, the same hospital employee who sedated me informed me that I was being moved out of the violent ward of the Copestone facility and being transferred to the non-violent ward. A different unknown deputy promptly escorted me to the non-violent ward of Copestone.

### FACTS ABOUT MISSION HOSPITAL CONFINEMENT
### BEYOND THE ALLOWED TIME – Section G.

**62.** My family submitted several requests to Mission Hospital demanding that they set me free from the defendants' custody. My sister contacted Mission Hospital over the phone on more than one occasion and demanded my immediate release. My brother also called and faxed a letter to Mission Hospital demanding that I be immediately released. In response to each of those verbal and written requests, Mission Hospital refused to set me at liberty or release me into my family's less restrictive care. "A State cannot constitutionally confine…a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends." O'Connor v. Donaldson, 422 U.S. 563 (1975).

**63.** Around the 14th day, a different hospital employee, an older tall Caucasian man who wore dark scrubs, told me: *If you keep talking like that, they'll keep you here longer.* I learned from that conversation with him that I should refrain from freely expressing my 1st Amendment rights if I hoped to be released from confinement.

**64.** I also discovered around that time that I must attend group sessions in order to be released. Prior to discovering these conditions for release, I had no idea what was expected of me to be released from the Copestone program because Mission Hospital staff purposely neglected to explain the program to me upon being taken into custody.

**65.** I was held against my will for 16 days at Mission Hospital without a lawful continuance, without a subsequent custody order, and without a commitment order. No subsequent custody orders were sought or issued to prolong my confinement. No court commitment hearing occurred during that time pertaining to my confinement in Mission Hospital's Copestone program. No lawful continuances were granted giving Mission Hospital permission to hold me beyond 10 days.

**66.** During the 16 days of confinement on Mission Hospital's premises, I held numerous religious conversations with patients, nurses and doctors about my religion, constitutional law, and even Satanism *(John Doe was a self-professed devil worshipper)*. Even with all the challenges facing me, I remained cordial throughout the experience. Even when a different patient tried to physically provoke me, I stayed calm. I was not in need of immediate hospitalization, and there was no real emergency. I was not in any danger whatsoever except for the County created danger.

**67.** Prior to being confined, I was in good health, both mentally and physically. However, as a result of being confined for 16 days and tranquilized two times in Mission Hospital's dangerous environment, my health declined. Fortunately, I was released after the 16th day of imprisonment. After I was released from the confinement, I immediately returned to the Biltmore Estate to retrieve my car keys from under said large rock by the flowing stream. I went to the parking lot to retrieve my car, but was informed by the Biltmore Police that my car was towed to a nearby impound. I retrieved my car from the tow yard and then drove my back to my house in Augusta, Georgia.

I suffered severe distress and bodily injury as a result of being held captive in Mission Hospital's Copestone ward. I could not function the same after my detainment in Mission Hospital's facility. As a result of the confinement, I began to suffer from paranoia, loss of sleep, emotional disruptions, and other distress. I likened the entire experience to *The Experiment*, a movie starring Forest Whitaker and Adrien Brody. I wrote the same in my computer exit interview with the hospital's admin and a social worker, however, they refused to disclose those records.

To this very day, I still battle against fear of mistreatment by medical professionals and unreasonable seizures by governmental employees. It took me about 2 years to recover and return back to my normal level of functionality due to the injuries I suffered during the confinement.

After I recovered enough to face the mental impact of the confinement, I requested my medical records from Mission Hospital. Once I had my medical records and court records in hand, I began to make reasonable inquiries with various law firms to ascertain my available remedies.

### FACTS ABOUT THE RELATIONSHIP BETWEEN
### MISSION HOSPITAL AND THE STATE – Section H.

**68.** "[C]ustody continues with law enforcement until the respondent is, in cases recommending commitment, transferred to a 24-hour facility." <u>McArdle v. Mission Hosp., Inc.</u>, 804 S.E.2d 214,

(2017). "The state's tactical referral of… medical care to private physicians should not deprive the [patients] of the means to vindicate their Eighth Amendment rights." <u>Conner v. Donnelly</u>, 42 F.3d 220 (4th Cir. 1994). The State and federal government provides funding to Missions Hospital, Inc. in order for it to satisfy the state's nondelegable duty to persons confined pursuant to state law:

> **NC Gen. Stat § 122C-2.** Policy. The policy of the State is to assist individuals with needs for mental health, developmental disabilities, and substance abuse services in ways consistent with the dignity, rights, and responsibilities of all North Carolina citizens. Within available resources it is the obligation of State and local government to provide mental health, developmental disabilities, and substance abuse services through a delivery system designed to meet the needs of clients in the least restrictive, therapeutically most appropriate setting available and to maximize their quality of life. It is further the obligation of State and local government to provide community-based services when such services are appropriate, unopposed by the affected individuals, and can be reasonably accommodated within available resources and taking into account the needs of other persons for mental health, developmental disabilities, and substance abuse services. State and local governments shall develop and maintain a unified system of services centered in area authorities or county programs. The public service system will strive to provide a continuum of services for clients while considering the availability of services in the private sector. Within available resources, State and local government shall ensure that the following core services are available: (1) Screening, assessment, and referral. (2) Emergency services. (3) Service coordination. (4) Consultation, prevention, and education. Within available resources, the State shall provide funding to support services to targeted populations, except that the State and counties shall provide matching funds for entitlement program services as required by law. As used in this Chapter, the phrase "within available resources" means State funds appropriated and non-State funds and other resources appropriated, allocated or otherwise made available for mental health, developmental disabilities, and substance abuse services. The furnishing of services to implement the policy of this section requires the cooperation and financial assistance of counties, the State, and the federal government.

**69.**     At all times relevant hereto, Mission Hospital's employees were acting within the scope of their employment with Mission Hospital as Buncombe County's agents to financially benefit themselves while carrying out the state's policy under N.C. Gen. Stat. §122C-261. By virtue of the powers and privileges granted to Mission Hospital and its employees as Buncombe County's agents under the state's mental health policy, Mission Hospital, Robin Bryson, and Hospital Does 1-10 unreasonably burdened my religious expression and pursuit of happyness under color of law.

70.     Buncombe County delegated that function to Mission Hospital's employees when the Unknown deputy took me to Mission Hospital to have my blood drawn. Buncombe County deferred to Mission Hospital's professional judgment, despite its recklessness. This analysis is not altered by the fact that Mission Hospital and its employees were paid by contract, and were not on the state payroll, nor by the fact Mission Hospital and its employees were not required to work exclusively for the State of North Carolina. "It is the physician's function within the state system, not the precise terms of his employment that is determinative." West v. Atkins, 487 U.S. 42 (1988). The Supreme Court held in that case that a private physician providing medical services to incapacitated persons for the State acts under color of state law when treating those persons and is subject to liability under 42 U.S.C. § 1983. The Supreme Court held that a physician's obligation to provide medical care does not set it at odds with the state. "Instead the physician cooperates with the state and assumes the state's constitutional obligation to provide medical care". Id.

71.     As a result of Mission Hospital and its employees' willful cooperation and close relationship with Buncombe County under North Carolina's Mental Health, Developmental Disabilities, and Substance Abuse Act of 1985, I suffered significant injuries and was deprived of my rights and immunities secured by the organic laws for the United States of North America.

72.     Given the facts alleged herein, former Sheriff Van Duncan failed in his duty to train, properly oversee, supervise, and direct the conduct of his deputies and agents in Buncombe County, including, but not limited to, the deputies and medical staff at Mission Hospital.

73.     As a direct and proximate result of the failure of the Sheriff to adequately train, monitor, and supervise his officers, agents, and medical staff, my right to be free from unreasonable seizures, my right to be free from forcible injections, and my right to receive adequate medical care while in custody, was purposely, repeatedly, and unnecessarily denied in violation of law.

74.     I repeatedly requested that the hospital provide the reason(s) for confining me and the names of every person involved in effecting the confinement. In response, my requests were deliberately and repeatedly denied, no "next steps" of the IVC process were given, and the names of all the persons who were involved in my arrest, transport, and confinement were withheld. Buncombe County is liable for the acts and omissions of the Sheriff, and it is also legally responsible for the improper implementation of the IVC process which put me in danger. Buncombe County and the hospital knowingly confined me in an unsafe and inadequate facility.

**75.** The aforementioned acts and omissions of the defendants were unnecessary, avoidable, and in wanton disregard of my rights. Despite my obviously serious physical injuries while in their custody, and my repeated requests for help and disclosure of facts, the defendants willfully and negligently refused to provide me with any required medical care or meaningful information.

**76.** These matters were raised in a formal complaint to the Sheriff's agent, Mission Hospital, on or about October 3, 2018. As I never received any response to that complaint, which was made on a recorded phone line, I believe that no investigation was made concerning my complaint.

**77.** The defendants, by their actions and omissions, were grossly negligent in their violation of the applicable provisions of state and federal law as well of common, ordinary care and decency as protected by the Constitution of the United States, and are liable to pay me for the damages.

**78.** I am entitled to damages against the defendants, jointly and severally, in an amount in excess of $10,000. Treble damages are authorized and sought relative to N.C. Gen. Stat. § 162-55.

**79.** After Mission Hospital assumed full custody of me on 9/26/2016, Mission Hospital still owed me the following duties: (1) They were required to keep me safe from harm while in its custody; (2) provide me with adequate and immediate medical treatment after I was physically injured by another patient; and (3) release me from Mission Hospital's 24-hour facility as soon as a less restrictive method of treatment became available or as soon as the conditions for confinement ceased to exist. At all times, the defendants owed me a standard of care that conforms to professional standards, but at all times, they seemed to be more focused on making money.

I, _Bro. T. Hesed-El_, the undersigned Affiant, affirm that the foregoing is true and correct. The Notary's Certificate is attached hereto.

Executed in good faith this ___9th___ day of April 2020 A.D.

Affiant, Bro. T. Hesed-El
c/o TAQI EL AGABEY MANAGEMENT
30 N. Gould Street, Suite R
Sheridan, WY 82801
Ph: (762) 333-2075
teamwork3@gmail.com

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the affidavit, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA
COUNTY OF ORANGE

Subscribed and sworn to (or affirmed) before me on this ___9ᵀᴴ___ day of ___Aᴘʀɪʟ___, 20_20_, by Bro. T. Hesed-El who proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

_____
Notary Signature



My commission expires on ___July 10, 2022___

**The "law of the land" requires that the administration of justice be consistent with fundamental principles of liberty and justice.** State v. Tolley, 290 N.C. 349 (1976).

## AFFIDAVIT OF APPEARANCE OF SPECIAL WITNESS

Personally appeared before the undersigned attesting officer authorized to administer oaths, George Dallas Lee IV, who after being duly sworn states under oath as follows:

1. My name is Mr. Georgie Dallas Lee, IV, and I am the older sibling of Mr. El. I have personally known my younger brother since the day of his birth in the year 1985. I am a citizen of the United States of America. I give this affidavit based on my personal knowledge for any and all uses in the above case.

2. On or around September 20, 2016, Mr. El was involuntarily detained against his will in the Mission Hospital, located at 509 Biltmore Ave, Asheville, NC 28801, under the allegations that he was sunbathing on private property while on a short vacation in Asheville, NC.

3. Mr. El is a respectable man, honest, of sound mind, an integral component of our family unit, and an upstanding member of his community. Mr. El has no history of mental illness.

4. Upon being made aware that my sibling, Mr. El, was being held against his will in 2016 at said hospital, I contacted the facility employees and advocated for his immediate release.

5. On or around October 5, 2016, Mr. El was released on his own recognisance. Mr. El is not, and never has been, a threat of harm to himself or others. There has been no repeat offense.

Further affiant sayeth not.

This _17_ day of January, 2019 A. D.

Affirmed and subscribed before me this

_17_ day of January, 2019 A.D.

_____
Notary Public

Renee H. Deaton
Notary Public
Buncombe County
North Carolina
My Commission Expires 8/23/2022

_____
GEORGE DALLAS LEE, IV (Witness)

Page 24 of 24